[Nos. 42412-2-I; 42439-4-I.    Division One.    December 13, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. CARLOS LINARES, ET AL., *Appellants*.

*Antonio Salazar* of *Salazar Law Offices*, for appellants.

*Norm Maleng, Prosecuting Attorney*, and *Charles Wesley Lind, Deputy*, for respondent.

AGID, A.C.J. — Carlos Linares and Carlos Vivas Nieves (Vivas) appeal their convictions for two counts of first degree robbery, arguing they were based on insufficient evidence. They also contend that the trial court erred by admitting evidence of an earlier, highly similar robbery as common plan evidence under ER 404(b) and imposing a 60-month firearm enhancement. In a pro se brief, Vivas contends that the trial court abused its discretion by admitting evidence of an unreliable photo montage identification. We affirm.

## FACTS

On October 18, 1996, Gregory Winokur, a jewelry store district manager, and Roger Smith, an armed security guard employed by the store, were transporting diamonds worth approximately $341,000 from the Southcenter Mall to the Bellevue Square Mall for a promotional sale. After parking in the Bellevue Square parking garage, Winokur opened his trunk to remove a large black box containing diamonds as Smith stood nearby. As Winokur was removing the box, a large gray sedan pulled up and a man approached them. Smith put his hand on his holster, but the

man, who was carrying his own silver revolver, put a gun to Smith's head, forced Smith and Winokur to the ground, and pulled the gun from Smith's holster. Winokur and Smith were suddenly surrounded by a group of five to seven men, several of whom carried handguns. The men took the box of diamonds, the luggage cart carrying the box, and Winokur's gold bracelet and watch and drove away.

Approximately six months later, on April 11, 1997, jewelry sales representative Bruce Bohn, who travels around the Seattle area presenting his merchandise to local stores, was carrying jewelry in his car worth $170,000. During the early afternoon, Bohn drove to the Sea-Tac Mall to see a movie and left the jewelry locked in the trunk of his car in the parking lot. In response to a report of a vehicle prowl, the Federal Way Police arrived in the parking lot to discover Bohn's car surrounded by several men. When they saw the patrol car, the men ran to a Lincoln parked nearby and attempted to drive away. When the patrol car pulled up behind it and activated its emergency lights, the car stopped. But before the officer could approach the Lincoln, it sped out of the parking lot. The officer followed and chased the Lincoln until all of its occupants jumped from the vehicle and ran in different directions. The police captured all of them, including Vivas and Linares. The officers then retrieved tools and stolen items thrown from the car during the pursuit, including screwdrivers, a knife, a portable fax machine and jewelry. A search of Linares and Vivas' hotel room revealed that both were from Los Angeles. They pleaded guilty to first degree theft.

In July 1997, nine months after the Bellevue robbery, Jason Lackey, who had been sitting in a nearby car in the Bellevue Square parking garage when the robbery occurred, examined a photo montage of suspects in the Federal Way robbery and identified Vivas as the person who had punctured Lackey's tire as he was leaving the parking garage the day of the robbery. Winokur, as well, identified Linares as the man who had held the gun to his head. Jeff Vaughn, who had assisted in the October 18th diamond

sale at Southcenter, identified Linares as having attended the Southcenter diamond show. And Sarah Morgan, a Bon Marché security officer, and Sean Robertson, a police officer, testified at trial that they "had contact" with Vivas in the Bon Marché, on October 18. Vivas and Linares were charged with two counts of first degree robbery and with being armed with a firearm during the commission of each offense. A jury found them guilty of the charged offenses, and they were each sentenced to 108 months—48 months for the underlying conviction[1] plus 60 months for the firearm enhancement.

## DISCUSSION

### Admissibility of the Photo Montage

In a pro se brief, Vivas contends that the trial court violated his due process rights by allowing evidence of an unreliable photographic identification.[2] Vivas relies primarily on Division Two's *State v. Shea*[3] decision to argue that Jason Lackey's identification was unreliable because he glimpsed the suspects through a rear view mirror, he could not provide police with a description of the suspects immediately after the crime occurred, and 10 months elapsed between the crime and his viewing of the montage. *Shea*, however, inexplicably diverged from well-settled Washington Supreme Court and Division One precedent which directs that unless the defendant alleges that the identification procedures were suggestive, the trial court is not to consider factors concerning the reliability of the montage identification in making its admissibility ruling. Here, the defense did not allege the montage itself was suggestive or that the police followed improper procedures in presenting

---

[1]They were each sentenced for one count of robbery because the trial court determined that both counts constituted the "same criminal conduct" for sentencing purposes.

[2]Vivas notes that lineups are preferred. But, at trial, the prosecutor told the court that he invited Vivas and Linares to participate in a lineup and their attorneys turned down the offer.

[3]85 Wn. App. 56, 930 P.2d 1232 (1997).

it to Lackey. The trial court thus correctly declined to follow *Shea* and instead admitted the identification subject to impeachment with the defense's reliability evidence.

An out-of-court photographic identification meets due process requirements if it is not so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification.[4] To establish a due process violation, a defendant must first show that an identification procedure is suggestive. If, and only if, it is, the court must determine whether, considering the totality of the circumstances, the suggestiveness created a substantial likelihood of irreparable misidentification.[5] At this point, courts typically consider: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation.[6]

In *State v. Vaughn*, the Washington Supreme Court clarified that courts should examine these five reliability factors *only* if the defendant meets his or her threshold burden of demonstrating that the identification procedure itself is suggestive.[7] The *Vaughn* court noted that the reliability factors were developed by the United States Supreme Court in *Manson v. Brathwaite* to overcome the presumption that identification evidence obtained through a concededly suggestive procedure is automatically inadmissible. In *Brathwaite*, although a witness identified a suspect after viewing only one photograph, the Court declined to adopt a per se rule of inadmissibility, holding instead that the corrupting

---

[4]*State v. Vaughn*, 101 Wn.2d 604, 682 P.2d 878 (1984).

[5]*Id.*

[6]*Shea*, 85 Wn. App. at 59.

[7]*State v. Vaughn*, 101 Wn.2d 604, 682 P.2d 878 (1984). Washington law on suggestive identification procedures evolved from three United States Supreme Court cases: *Simmons v. United States*, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968); *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); and *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

effect of the suggestive identification procedure was required to be balanced against certain factors indicating reliability.[8] As the *Vaughn* court recognized, consideration of reliability factors in *Brathwaite* was meant to "facilitate the admission of identification testimony, not hamper it."[9]

█ Without mentioning *Vaughn*, Division Two decided a decade later in *Shea* that this two-step test should be merged, and that the five reliability factors should be considered as part of the threshold question of whether the identification procedure was suggestive. The test became, therefore, whether "considering the totality of the circumstances and the above five factors, the given procedure leads to a substantial likelihood of irreparable misidentification."[10] The *Shea* court thought it "apparent that merging the two steps can lead to clearer analysis and still bar identifications that deny due process."[11] We respectfully disagree. By abandoning the threshold procedure test, the *Shea* test unnecessarily complicates the admissibility inquiry and allows courts to engage in fact finding that could result in suppression. In *State v. Eacret*,[12] we recently reaffirmed the *Vaughn* holding that "[w]hen there is no evidence of suggestiveness in the photographic identification procedure, the inquiry ends; in such a case, any uncertainty or inconsistency in identification testimony goes only to its weight, not to its admissibility."[13] This rationale properly leaves reliability determinations to the jury when no suggestive identification procedures are alleged.

Here, James Cook, an employee of the United States Immigration and Naturalization Service who was present when the witnesses individually viewed the montages on the steps of the Regional Justice Center, explained to the

---

[8]*Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

[9]101 Wn.2d at 609.

[10]*Shea*, 85 Wn. App. at 60.

[11]*Id.*

[12]94 Wn. App. 282, 971 P.2d 109 (1999).

[13]*Id.* at 285 (citing *Vaughn*, 101 Wn.2d at 610-11).

trial court that the montages were grouped in four sheets with six photographs on each sheet, and that each sheet contained the photograph of one person arrested during the Federal Way robbery. Nothing in this explanation raised questions about an impermissibly suggestive or irregular procedure, which *Eacret* defined as "one that directs undue attention to a particular photo."[14] Significantly, Vivas does not even allege that the identification procedure was irregular. The trial court recognized that under *Vaughn*, the due process clause does not condition admissibility of identification testimony on proof of its reliability and appropriately ended the inquiry. The jury alone may decide what weight to give to the testimony. The trial court's ruling was correct.

A majority of the panel having concluded that the remainder of this opinion lacks precedential value, it is ordered that only the foregoing will be published. The balance of the opinion will be filed for public record as provided in RCW 2.06.040.

COLEMAN and GROSSE, JJ., concur.

Review denied at 140 Wn.2d 1027 (2000).