[Nos. 24940-5-II; 24942-1-II. Division Two. August 24, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. JOHN P. VICKERS, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. PAUL T. VICKERS, *Appellant*.

*Pattie Mhoon* and *Mary Katherine Young High*, for appellants (appointed counsel for appeal).

*Gerald A. Horne, Prosecuting Attorney*, and *Barbara L. Corey-Boulet, Deputy*, for respondent.

HUNT, A.C.J. — John Vickers appeals convictions for first degree felony murder and attempted first degree murder with firearm enhancements on both counts. Paul Vickers appeals convictions for aggravated first degree murder and attempted first degree murder with firearm enhancements on both counts. They argue that we should reverse their convictions because the police seized some evidence with a defective warrant. John Vickers also contends that the State did not prove the constitutionality of his out-of-state convictions used to establish his persistent offender status. Both raise numerous other issues. We hold that: (1) even assuming a defective warrant, the evidence seized under it was of little consequence and that there was sufficient other untainted evidence to support the verdicts; (2) the State met its burden of proof for the out-of-state prior convictions; and (3) there are no reversible errors. Accordingly, we affirm.

## FACTS PERTINENT TO PHOTOMONTAGE

### I. PRELUDE

During conversations with Tary Rodoker, brothers Paul and John Vickers discussed committing robberies. Once, Paul said, "[Y]ou are supposed to go in shooting and don't

leave any witnesses." John replied, "Yeah." In November 1997, Paul told Rodoker that he was "broke" and he "should just go do a robbery." Later, in January 1998, Rodoker noticed that Paul was depressed because he had no money. Tim McGowan also heard Paul say that if he committed a robbery, he would use "extreme intimidation." Paul asked McGowan to participate in a robbery with him and John, but McGowan declined.

On January 23, Phil Vickers signed for UPS packages addressed to his brother, Paul Vickers. When Phil realized that the packages contained a large quantity of ammunition, he was upset that he had signed for the package. Phil asked Paul how he could afford to pay for ammunition, and Paul replied that he had used a bad credit card.

Alarmed by the Vickers' behavior, Rodoker contacted Pierce County Detective Bruce Larson before January 24, 1998, to tell him that, based on conversations with the Vickers brothers, she feared they might commit a robbery and go in shooting. She had previously worked with Larson as a confidential informant.

On the evening of January 24, 1998, John and Paul Vickers took the ferry from Anderson Island to Steilacoom and went to the 38th Street Pub (The Pub) in Tacoma. When they entered wearing dark clothing and bandannas covering their heads,[1] they caught the attention of bartender Gloria Cox and security guard Robert Williamson, who was sitting at the bar with his fiancee, Brenda Bottrell. The Vickers brothers stayed about 15 minutes, ordering beers and strolling around The Pub. When they walked into the adjacent cardroom, card dealer Theresa Dills noticed them because they were attractive. She asked if they wanted to play. They declined, saying that they wanted to look around. Dills watched them peer around the room;

---

[1] The Vickers brothers were known to wear bandannas. John Vickers was known to chew tobacco.

they paid particular attention to the corners. She thought they were acting oddly.[2]

After the Vickers brothers left, Cox picked up their beer bottles and noticed that one bottle contained tobacco juice and saliva. Just before midnight, Dills left because she was ill. As she left, she noticed a black car with two people inside, parked by the side of The Pub; she thought it odd that they had parked there because the parking lot was not full.

## II. ROBBERY AND MURDER AT THE PUB

Just after midnight, two men entered the 38th Street Pub wearing ski masks and gloves, armed with an automatic rifle and shotgun. They immediately fired and ordered everyone to the ground. Their shots hit Williamson and Bottrell, killing Bottrell. The gunmen took $1500-1600 from The Pub, put it in a white cloth bag, and left. Witnesses saw them walk across the parking lot to the adjoining alley, get into an older car painted flat black, and drive away. Police officers recovered five 7.62 mm shell casings and two 12-gauge shotgun shells from The Pub.

## III. AFTERMATH

At around 7:40 A.M. the next morning, John Sanchez saw John and Paul Vickers at the Steilacoom ferry dock waiting to catch the first ferry back to Anderson Island. When he commented that they looked tired, one of the brothers said that they had been up all night.

Later that same morning, Norman Forsythe saw Paul Vickers, who told him that he had parked his car[3] in the alley beside the 38th Street Pub, robbed The Pub, and shot the security guard and a woman. Later that day, Forsythe was again with Paul Vickers when a news account of the

---

[2] The Vickers brothers argue that the men wearing bandannas entered the Pub around 9:30 P.M. The Pub's security guard testified that it was around 11:00 or 11:30 P.M. The last ferry on Saturday coming from Anderson Island to Steilacoom on the mainland had run at either 9:20 or 10:30 P.M.

[3] The car was flat black and hand-painted.

robbery came on television; when the victim's mother appeared on the screen, Vickers stated that he "would shoot the bitch too." Paul Vickers asked Forsythe to provide an alibi for him, but Forsythe refused.

John Vickers also told Forsythe about his part in the robbery. He admitted having fired two shots from his double-barreled shotgun but said that he had difficulty reloading.

Forsythe went with the Vickers brothers to Tacoma, where they bought a crate in which to bury the guns used in the robbery. John also bought a gun for $330, which used the same 7.62 mm shells as Paul's SKS 7.62 mm semi-automatic rifle.

That same day, John Vickers' girl friend, Rachel Krause, went with Rodoker to Tacoma to buy methamphetamine, taking $150 John had given her that morning. Krause noticed that John was upset when he gave her the money. Both she and Rodoker considered the money gift odd because both brothers were "broke."[4]

After the robbery/murder, Rodoker again contacted the police and reported that Paul owned an SKS automatic rifle,[5] Paul had a 12-gauge shotgun, Paul owned a flat-black Plymouth Arrow, and both brothers had left Anderson Island the day of the shooting. She believed that the Vickers brothers had committed the crime. Upon hearing about the murder and robbery, Phil Vickers, brother of John and Paul, contacted the police on January 29, 1998, with his suspicions about his brothers' possible involvement.

## IV. INVESTIGATION

Based on Rodoker's information, officers procured a warrant to search the home of Rachel Krause, with whom John lived, and Paul's home and car. On January 30, 1998,

---

[4] A Department of Social and Health Services officer testified that the Vickers brothers were on food stamps with "zero income" at the time.

[5] SKS rifles fire 7.62 mm shells.

officers executed the search warrant and seized shotgun shells, a can of Skoal chewing tobacco, a wallet containing John's identification, bandannas, an SKS rifle manual, and live 7.62 mm shells. The car matched the one seen leaving The Pub the night of January 25. They found no weapons, but they later learned that the guns had been buried.

Police arranged for Phil Vickers to call his brothers over to his business. The police hid in Phil's office. When John and Paul arrived and saw the police, they ran. Paul threw down a bandanna and screamed that the officers would have to kill him to catch him. After a brief chase, the officers arrested Paul and John Vickers.

In addition to providing police information about Paul's earlier ammunition purchase and Phil's suspicions, Phil told the police that Paul owned an SKS rifle and a black Plymouth Arrow, John owned a shotgun, they liked to target-practice on McGowan's property, and he (Phil) had twice taken Paul to The Pub.

The police contacted McGowan, searched the part of his property that the Vickers brothers used for target practice, found spent 7.62 mm and 12-gauge shell casings, and took McGowan's gun into custody. Subsequent ballistics tests confirmed that these casings came from the same guns that were used in the robbery and assaults at The Pub. The testing eliminated McGowan's gun as a possible weapon in these crimes.

Police arrested Paul and John Vickers, compiled two photomontages, and called in witnesses from The Pub who had seen the men enter, act suspiciously, and leave a short time before the masked robbers entered. Williamson identified one Vickers brother as one of the men who caught his attention on January 24. Dills identified both brothers. Cox identified John.

## V. TRIAL

The State charged John and Paul Vickers with one count of first degree murder with aggravating circumstances or,

in the alternative, first degree felony murder, and one count of attempted first degree murder, with firearm enhancements on both counts.

Before trial, Paul moved: (1) to suppress evidence seized during the search, arguing that the warrant was defective; (2) to sever his trial from John's; and (3) to suppress the photo identification. John also moved to suppress evidence and to sever his trial from Paul's. The trial court denied the motions. Following the suppression hearing, the trial court issued an oral ruling, but it never entered written findings fact and conclusions of law.[6]

The jury convicted John of first degree felony murder and attempted first degree murder, with weapon enhancements on both counts. The jury convicted Paul of aggravated first degree murder and attempted first degree murder, with weapon enhancements on both counts. The trial court sentenced Paul to mandatory life imprisonment without the possibility of parole for his conviction of first degree murder with aggravating circumstances. The trial court also sentenced John, a persistent offender, to life imprisonment. RCW 9.94A.120(4).

## ANALYSIS

### I. Photomontage

Paul Vickers claims that an impermissibly suggestive photomontage violated his due process rights because: (1) his was the only Department of Licensing photo among five other MUGGIS[7] photos; (2) the background in his photo was lighter than the other photos; and (3) he was the only person not wearing coveralls in the montage.[8] He argues

---

[6] The trial court declined to enter written findings after the case was on appeal.

[7] Although there is no definition of the term "MUGGIS" in the record, we understand the term to refer to "mug shots."

[8] The police used Vickers' license photo, rather than the only MUGGIS photo they had, because he had an injury on his face (from the scuffle at his arrest) in his MUGGIS photo that would have made him stand out even more.

that this suggestiveness created a substantial likelihood of misidentification when analyzed under *Neil v. Biggers*, 409 U.S. 188, 199, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and *State v. Cook*, 31 Wn. App. 165, 172, 639 P.2d 863 (1982).[9] But the law is to the contrary.

■■ An out-of-court photographic identification meets due process requirements if it is not so impermissibly suggestive as to create a substantial likelihood of irreparable misidentification. *State v. Linares*, 98 Wn. App. 397, 401, 989 P.2d 591 (1999) (citing *State v. Vaughn*, 101 Wn.2d 604, 682 P.2d 878 (1984)), *review denied*, 140 Wn.2d 1027 (2000); *State v. Weddel*, 29 Wn. App. 461, 476-77, 629 P.2d 912 (1981). Vickers bore the burden of first showing that the procedure was impermissibly suggestive. *Linares*, 98 Wn. App. at 401 (citing *Vaughn*, 101 Wn.2d 604). When a defendant fails to show impermissible suggestiveness, the inquiry ends. *Vaughn*, 101 Wn.2d at 609-10.[10]

---

[9] These reliability factors include: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description, (4) the level of certainty at the confrontation, and (5) the length of time between the crime and the confrontation. *Cook*, 31 Wn. App. at 172.

[10] Only after the defendant first shows impermissible suggestiveness does the inquiry turn to whether the identification was nevertheless reliable, using the *Biggers* factors. *Vaughn*, 101 Wn.2d at 610-11. Reliability is generally a question for the finder of fact. *Vaughn*, 101 Wn.2d at 610-11; *Weddel*, 29 Wn. App. at 476-77 (Division Two); *Linares*, 98 Wn. App. at 402 (Division One).

We depart here from our previous decision in *State v. Shea*, 85 Wn. App. 56, 59-60, 930 P.2d 1232 (1997), insofar as it merges the two separate steps of assessing suggestiveness and reliability of a photographic showup. Such a merger appears contrary to the two-step process, which our Supreme Court adopted in *Vaughn* and has not thus far abandoned. Moreover, the *Vaughn* decision relied in part on our earlier analysis in *Weddel* (Judges Reed, Petrie, and Petrich, citing cases from several other states):

Although the photographic array used in this case was less than ideal, it was not so impermissibly suggestive as to deny defendant due process of law. Defendant having failed to establish a constitutional violation, the validity of the identification procedure and the weight to attach to it were questions for the jury to determine.

*Weddel*, 29 Wn. App. at 475-76 (footnote omitted). In turn, *Weddel, Vaughn,* and Washington law on suggestive identification procedures evolved from three United States Supreme Court cases: *Simmons v. United States*, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968); *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375,

■ Here, finding that any differences were too slight to be impermissibly suggestive, the trial court denied Paul's motion to suppress the montage identification. Our independent review of the montage supports the trial court's determination. Each picture appears to be the same size and shows a man with dark scalp hair and facial hair (mustaches and goatees),[11] and of approximately the same age. In light of these substantial similarities, the trial court was justified in ruling that any differences between Paul's photo and the other five were minor.[12]

"Minor differences" in photos "are not suggestive enough to warrant further inquiry into the likelihood of misidentification." *State v. Eacret*, 94 Wn. App. 282, 285, 971 P.2d 109 (1999). *Accord State v. Hendrix*, 50 Wn. App. 510, 513-14, 749 P.2d 210 (1988) (defendant's photo the only one with tiny number in the corner); *Weddel*, 29 Wn. App. at 474-76 (defendant's photo 1/4 inch larger and with unique background) (cited in *Vaughn*, 101 Wn.2d at 610-11). Therefore, the trial court committed no error in admitting identifications based on the montage, which was not impermissibly suggestive.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

SEINFELD, J., concurs.

---

34 L. Ed. 2d 401 (1972); and *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

*Linares*, 98 Wn. App. at 401 n.7.

[11] From the bartender's face-to-face encounter with the men, the police had some indication that at least one of the men who had been in The Pub before the shooting had a goatee and the other had wavier hair.

[12] Moreover, that two other witnesses from the Pub could not identify Paul from the montage further evinces that the montage was not impermissibly suggestive.

MORGAN, J. (concurring) — I write separately because I am not sure we must "depart"[13] from *State v. Shea.*[14] I agree, however, that *Shea* should be clarified.

The problem involves the relative functions of judge and jury when a defendant claims that an eyewitness identification is not reliable. What are those functions in general? What are those functions when the eyewitness identification is alleged to have been tainted because the police acted in an impermissibly suggestive manner?

The first question is governed by ER 602. As the Washington Supreme Court has explained:

> Under ER 602, a witness must testify concerning facts within his personal knowledge, that is, facts he has personally observed. . . . However, the rule requires only that evidence "sufficient to support a finding" of personal knowledge be introduced. Thus, testimony should be excluded only if, as a matter of law, no trier of fact could reasonably find that the witness had firsthand knowledge.[15]

In short, the judge determines whether a finding of personal knowledge *could* be made, and the jury determines whether a finding of personal knowledge *should* be made.

The second question is governed by case law. If the defendant alleges that an eyewitness identification was tainted because the police acted in a manner that was impermissibly suggestive, the judge determines, according to a preponderance of the evidence,[16] (1) whether the police acted in an

---

[13] *See* majority at 967 n.10.

[14] *State v. Shea*, 85 Wn. App. 56, 930 P.2d 1232 (1997).

[15] *State v. Vaughn*, 101 Wn.2d 604, 611-12, 682 P.2d 878 (1984); *see also State v. Gosby*, 85 Wn.2d 758, 760-61, 539 P.2d 680 (1975).

[16] No Washington case has expressly applied a preponderance test to the questions of preliminary fact described in this sentence, but other states have. *Commonwealth v. Santos*, 402 Mass. 775, 525 N.E.2d 388, 392 (1988); *see also State v. Kelly*, 2000 ME 107, 752 A.2d 188, 192 (quoting *State v. True*, 464 A.2d 946, 950 (Me. 1983) ) ("defendant must prove, by a preponderance of the evidence, that the identification procedure was suggestive; i.e., that it 'tended to "increase the likelihood of misidentification." ' ") (quoting *Neil v. Biggers*, 409 U.S. 188, 198, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); *State v. Cook*, 330 N.J. Super. 395, 750 A. 2d 91, 103 (2000) ("judge must first decide whether the procedure utilized by the

impermissibly suggestive manner when dealing with the witness; and (2) whether such actions so affected the witness as to create a likelihood of misidentification.[17] As the United States Supreme Court has explained:

> [T]he primary evil to be avoided is "a very substantial likelihood of irreparable misidentification." *Simmons* v. *United States*, 390 U.S. [377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968)]. While the phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of "irreparable" it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself. It is the likelihood of misidentification which violates a defendant's right to due process, and it is this which was the basis of the exclusion of evidence in *Foster* [*v. California*, 391 U.S. 902, 88 S. Ct. 1654, 20 L. Ed. 2d 416 (1968)]. Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous. But as *Stovall* [*v. Denno*, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d

---

State was in fact impermissibly suggestive, and the defendant bears the burden by a preponderance of the evidence to establish that the identification procedure was suggestive so as to result in a substantial likelihood of misidentification.")). Moreover, the United States Supreme Court has applied a preponderance test to both constitutional questions of preliminary fact, *see Medina v. California*, 505 U.S. 437, 438, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992); *Colorado v. Connelly*, 479 U.S. 157, 158, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986); *United States v. Matlock*, 415 U.S. 164, 177, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974); *Lego v. Twomey*, 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972), and evidential questions of preliminary fact. *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987).

[17] In *State v. Karpenski*, 94 Wn. App. 80, 971 P.2d 553 (1999), we distinguished the use of a sufficiency test, as under ER 602, from the use of a preponderance test as stated in this sentence. We said:

> The trial judge decides preliminary questions of fact under ER 104(a). In doing so, he or she does not always exercise the same kind of discretion. When dealing with some preliminary questions, the judge inquires whether the evidence is sufficient to support a finding of the needed fact. When dealing with other such questions, the judge inquires whether the evidence preponderates in favor of the needed fact. The difference is important because it controls whether the judge may reject inferences favorable to the proponent; the judge may not when inquiring whether the evidence is sufficient, but the judge may when inquiring whether the evidence preponderates.

*Karpenski*, 94 Wn. App. at 102-03 (footnotes omitted).

1199 (1967)] makes clear, the admission of evidence of a showup without more does not violate due process.[18]

In short, the police have a due process duty to act in a reasonably neutral manner when seeking and obtaining an eyewitness identification; they violate that duty by acting in an impermissibly suggestive manner; but the violation warrants suppression only if it results in a likelihood of misidentification.

As I read *Shea*, it did not necessarily depart from these principles. In *Shea*, the defendant moved to suppress based on impermissibly suggestive police misconduct, the trial court *denied* the motion, and this court *affirmed* the denial. This court noted that a trial court can and often does *deny* such a motion by skipping over whether there was police misconduct and jumping directly to whether there was a likelihood of misidentification.[19] This court did not consider, for it had no need to consider, whether it or a trial court could *grant* such a motion using that same reasoning. Thus, I would clarify *Shea* as follows: (1) A court can *deny* a motion to suppress for impermissibly suggestive police misconduct by finding *either* (1) that there was no impermissibly suggestive police misconduct *or* (2) that there was no likelihood of misidentification. A court can *grant* such a motion only if it makes *both* findings. As Division One has correctly noted, to *grant* such a motion without making the first finding is to violate the judge's scope of discretion, for it amounts to the judge assessing a witness' reliability for reasons unrelated to police misconduct.[20]

Having added these remarks, I agree with the majority's reasoning and result.

Review granted at 146 Wn.2d 1001 (2002).

---

[18] *Neil v. Biggers*, 409 U.S. 188, 198, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972) (footnote omitted).

[19] *See Shea*, 85 Wn. App. at 59 n.2.

[20] *See State v. Linares*, 98 Wn. App. 397, 401-02, 989 P.2d 591 (1999), *review denied*, 140 Wn.2d 1027 (2000).