# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON | ) | No. 70123-1-I |
| | ) | |
| Respondent | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| T.G., DOB 3/12/97, | ) | |
| | ) | |
| Appellant. | ) | FILED: June 9, 2014 |

LEACH, J. — T.G. appeals his juvenile court adjudication and disposition for attempted residential burglary. He contends that the court erred in refusing to suppress the fruits of an unlawful Terry[1] stop and that an impermissibly suggestive showup violated his right to due process. But the specific facts and circumstances known to the police officers who detained T.G. supported a reasonable suspicion that he was involved in a recent attempted burglary. The record also supports the court's determination that the showup procedure was reliable and did not create a substantial likelihood of misidentification. We affirm.

---

[1] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

FACTS

Shortly before 9:50 a.m. on May 3, 2013, Erin Waldon heard "insistent doorbell ringing" and pounding on the front door of her Kent home. Waldon, who was home alone, thought her husband might have forgotten his key and walked toward the front door. Because she noticed the doorknob turning, she looked out the kitchen window. There she saw two teenaged boys standing outside the window and facing her. The window screen was gone, and one of the boys was trying to slide open the window.

Waldon stood about two feet from the window. Although the window blinds were down, the slats were turned horizontally, and Waldon had "an unobstructed view" of the boys' faces. Upon seeing Waldon, the boys appeared surprised, and their eyes widened. Waldon looked at the boys for "[a]t least a good three seconds, if not longer" before they turned and ran away.

At 9:50 a.m., Waldon called 911 and reported the incident. She described one of the suspects, later identified as T.G., as "5'8", approximately 14-15 years old, very thin, reddish brown hair, possibly wearing a backpack, wearing dark clothing." She described the other suspect, later identified as D.G., as "5'8", approximately 14-15 years old, very thin, dark black hair, and Asian." Waldon explained that she had described one of the boys as Asian in response to the 911 operator's suggestion of the "closest nationality." Waldon acknowledged that

she "got a better look" at the boy with the darker hair and complexion but maintained she had a "reasonable identifying look" at the other boy.

Kent Police Officer John Ross arrived at Waldon's home at 9:53 a.m. After speaking briefly with Waldon, Officer Ross left and searched the immediate area for the suspects. Waldon thought the boys had fled in a northerly direction, but Ross thought they might be high school students and drove south toward Kent-Meridian High School, which was about one-third of a mile from Waldon's house.

At 10:03 a.m., Ross drove by a bus stop shelter near the school and saw two teenaged boys who generally matched Waldon's description. One of the boys was tall and skinny with "possibly reddish hair." The other boy "had [an] olive type of complexion that could have . . . been an Asian male description." Both boys were wearing light-colored T-shirts and had backpacks. Ross radioed that he had found two possible suspects.

Ross parked his patrol car in a nearby parking lot and walked over to the boys. Because it was raining and cold, Ross thought it unusual that both boys were wearing only T-shirts. He also noticed that both boys had wet hair but that their T-shirts were dry. Based on his experience, Ross suspected that they had recently removed some clothing.

Ross asked the boys to move a short distance away from the other people in the bus shelter so that he could speak with them in private. They identified themselves as T.G. and D.G. and said they attended Kent-Meridian High School. Ross called the school resource officer and confirmed the information. The boys said they were on their way to school after retrieving a book that D.G. had left at a friend's house. Ross found the explanation odd because the boys had been standing in the bus shelter, even though the school was only a few hundred yards away.

Ross asked T.G. if he would "mind" opening his backpack "to make sure there's just school stuff in there." T.G. opened his backpack, revealing a dark jacket that was wet on one side.

At 10:07 a.m., Officer Jason Jones arrived at Ross's location with Waldon for a showup identification. Before transporting Waldon, Jones read her the standard instructions for field identification procedures:

> You'll be asked to look at the person or persons we have stopped. The fact that we have this person stopped and may be handcuffed, should not influence your judgment.
>
> You should not conclude or guess a person is the one who committed the crime. You are not obligated to identify anyone. It's just as important to free innocent persons from suspicion, as it is to identify guilty parties.

Waldon responded that she understood.

-4-

While sitting in the patrol car about 45 feet away, Waldon looked at T.G. and D.G. through the front passenger window. Waldon told Jones that "they kind of look like the boys," but she was not 100 percent sure. Waldon testified that her view was obscured by the distance and the rain on the window and that "I didn't want to identify someone if it wasn't the actual person that had tried to break in."

Without any further discussion, Officer Jones got out of the patrol car and joined the other officers. Jones and another officer spoke with T.G. and D.G. individually. Jones also photographed the boys.

After about 10 minutes, Jones returned to the patrol car and planned to transport Waldon back to her home. Waldon asked Jones if he "could bring the boys closer, so she could get a better look." Officer Ross then brought T.G. and D.G. to within 25 feet of the front windshield of the patrol car. Waldon immediately yelled, "That's them." She said that she had not gotten a good look at the suspects' clothing, but that she would never forget their faces. Waldon added that she was "100 percent sure."

At 10:25 a.m., Officer Jones informed the other officers of the identification. The officers then arrested T.G. and D.G.

The State charged T.G. in juvenile court with one count of attempted residential burglary. T.G. moved to suppress evidence seized following his initial

detention, including custodial statements. The juvenile court denied the motion, concluding that police officers lawfully detained T.G. prior to his arrest. The court admitted Waldon's out-of-court and in-court identifications of T.G. but excluded certain custodial statements. At the fact-finding hearing, Dr. Geoffrey Loftus testified about various factors that affect the reliability of eyewitness identifications.

The juvenile court found T.G. guilty as charged and imposed a disposition of 5 days in juvenile detention, 15 days of electronic home monitoring, 6 months of probation, and 16 hours of community service. T.G. appeals, challenging the court's denial of his suppression motion

## STANDARD OF REVIEW

We review the trial court's decision on a motion to suppress to determine whether substantial evidence supports the findings of fact and whether those findings, in turn, support the conclusions of law.[2] Here, the majority of the juvenile court's findings of fact are unchallenged and are therefore verities on appeal.[3] We review challenged conclusions of law de novo.[4]

---

[2] State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009).
[3] See State v. Broadaway, 133 Wn.2d 118, 131, 942 P.2d 363 (1997).
[4] State v. Armenta, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997).

ANALYSIS

T.G. contends that Officer Ross lacked an articulable suspicion that he was involved in the attempted burglary and that his detention was therefore unlawful from its inception. He further maintains that even if the initial stop was lawful, the officers exceeded its permissible scope when they continued to detain him after Waldon failed to identify him during the first showup.

Consistent with the Fourth Amendment and article I, section 7 of the Washington State Constitution, police officers may conduct an investigatory stop if the officers have a reasonable and articulable suspicion that an individual is involved in criminal activity.[5] The necessary level of articulable suspicion is "a substantial possibility that criminal conduct has occurred or is about to occur."[6]

We review the reasonableness of the officer's suspicions by considering the totality of the circumstances known to the officer at the time of the stop.[7] The determination of reasonable suspicion "'must be based on commonsense judgments and inferences about human behavior.'"[8]

Within 10 minutes of responding to Waldon's 911 call, Officer Ross noticed the two teenaged boys standing in the bus shelter. The shelter was

_____

[5] State v. Sieler, 95 Wn.2d 43, 46, 621 P.2d 1272 (1980); see also Terry, 392 U.S. at 21.
[6] State v. Kennedy, 107 Wn.2d 1, 6, 726 P.2d 445 (1986).
[7] State v. Lee, 147 Wn. App. 912, 917, 199 P.3d 445 (2008).
[8] Lee, 147 Wn. App. at 912 (quoting Illinois v. Wardlow, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)).

about one-third of a mile from Waldon's home and within easy walking distance. The boys also matched several specific details of Waldon's description. T.G. was 15 with brown hair that Officer Ross thought might be reddish, about 5'10" tall, and skinny. D.G. was apparently somewhat shorter and, according to Ross, had an "olive type of complexion that could have, I thought, . . . been an Asian male description." Both boys were wearing backpacks.

Waldon told the 911 operator that the suspects were wearing dark clothing. Both T.G. and D.G. were wearing light-colored T-shirts in the bus shelter. Officer Ross noticed that both boys had wet hair, but their T-shirts were dry, even though it was raining. Based on his experience, Ross suspected that the boys had removed some outer clothing.

Considered together and in light of the officer's experience, the suspects' resemblance to the reported descriptions, the location and time of the encounter, and the discrepancies between the weather conditions and the suspects' clothing constituted specific and articulable facts supporting an inference that T.G. may have been involved in the attempted burglary. The officer's decision to detain the boys for further investigation was reasonable.

T.G. contends that even if the initial stop was lawful, the officers exceeded the permissible scope of an investigatory detention. The scope of a permissible investigatory stop necessarily depends on the specific facts of each case.[9]

> A lawful Terry stop is limited in scope and duration to fulfilling the investigative purpose of the stop. If the results of the initial stop dispel an officer's suspicions, then the officer must end the investigative stop. If, however, the officer's initial suspicions are confirmed or are further aroused, the scope of the stop may be extended and its duration may be prolonged.[10]

The investigative methods "must be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."[11] Relevant factors for determining the permissible scope of an investigatory detention include "the purpose of the stop, the amount of physical intrusion upon the suspect's liberty, and the length of time the suspect is detained."[12]

Here, the officers' detention of T.G. was directly related to their investigation of an attempted burglary. Although Officer Ross moved T.G. and D.G. away from the bus shelter to talk to them in private, he did not draw his weapon, conduct a pat-down, handcuff them, or physically confine them during the questioning. The investigation was relatively brief, lasting about 20-25

---

[9] State v. Bray, 143 Wn. App. 148, 154, 177 P.3d 154 (2008).
[10] State v. Acrey, 148 Wn.2d 738, 747, 64 P.3d 594 (2003) (footnote omitted).
[11] State v. Williams, 102 Wn.2d 733, 738, 689 P.2d 1065 (1984).
[12] Williams, 102 Wn.2d at 740.

minutes from the initial detention until Waldon positively identified T.G. and D.G. during the second showup.

Significantly, Officer Ross's suspicion was aroused almost immediately when the boys confirmed they attended Kent-Meridian High School and claimed they were on their way to the nearby school, even though they had been standing in the bus shelter. Ross also suspected that the boys had recently changed their outer clothing because their hair was wet and their T-shirts were dry. Ross's suspicion was reinforced when T.G. opened his backpack to reveal a dark jacket that was wet on one side.

Finally, contrary to T.G.'s assertion, Waldon's response to the initial showup did not automatically require his release. Upon seeing the suspects initially from a greater distance, Waldon indicated a possible identification but acknowledged that she was not positive. Given the other circumstances, Waldon's reaction did not necessarily dispel the officers' suspicions, and the decision to continue the detention briefly to interview the two suspects separately was reasonable. That questioning lasted no more than 10 minutes before Waldon positively identified both suspects.

Under the circumstances, the brief detention was directly related to the investigation of the attempted burglary and used minimally intrusive means to

verify or dispel the officers' suspicions in a short period of time. The officers did not exceed the permissible scope of the investigatory detention.

T.G. contends that the discovery of the wet jacket in his backpack did not justify his detention because the evidence fails to support the juvenile court's finding that he voluntarily consented to the search. But T.G. failed to challenge the search of his backpack either in his written motion to suppress or in argument to the juvenile court.

Generally, this court will decline to consider a suppression argument that is raised for the first time on appeal.[13] T.G.'s challenge to the voluntariness of consent does not fall within the limited exceptions to the general rule.[14] Nor does he contend that the issue involved a manifest constitutional error warranting review for the first time on appeal under RAP 2.5(a).

The voluntariness of a consent to search is a highly fact-specific determination.[15] Because T.G. failed to raise the issue, the juvenile court had no opportunity to consider all of the relevant circumstances and enter the findings of fact necessary to permit meaningful appellate review. Accordingly, we decline to address the issue.

---

[13] State v. Garbaccio, 151 Wn. App. 716, 731, 214 P.3d 168 (2009) (declining to address alleged erroneous statement in search warrant affidavit).
[14] See State v. Robinson, 171 Wn.2d 292, 305, 253 P.3d 84 (2011).
[15] See State v. O'Neill, 148 Wn.2d 564, 588, 62 P.3d 489 (2003).

Moreover, even without the evidence in T.G.'s backpack, the circumstances known to the officers, including the boys' physical appearance, their explanation for their presence in the bus shelter, and the discrepancies between the weather and their clothing, justified a brief extension of the initial stop for further investigation. Consequently, even if the juvenile court had suppressed the contents of T.G.'s backpack, the investigatory detention did not exceed its lawful scope.

T.G. next contends that the showup procedures were impermissibly suggestive, making both Waldon's initial identification and later in-court identification unreliable and inadmissible. We disagree.

An out-of-court identification procedure violates due process if it is so impermissibly suggestive as to give rise to "a substantial likelihood of irreparable misidentification."[16] A defendant claiming a due process violation must first establish that the identification procedure was "unnecessarily suggestive."[17] If the defendant satisfies this threshold burden, the court then assesses whether, under the totality of the circumstances, the procedure was so suggestive as to create a substantial likelihood of irreparable misidentification.[18]

---

[16] State v. Linares, 98 Wn. App. 397, 401, 989 P.2d 591 (1999).
[17] State v. Guzman-Cuellar, 47 Wn. App. 326, 335, 734 P.2d 966 (1987); see also State v. Vickers, 148 Wn.2d 91, 118, 59 P.3d 58 (2002).
[18] Vickers, 148 Wn.2d at 118.

The key factor in determining admissibility is whether sufficient indicia of reliability supported the identification despite any suggestiveness.[19] In making this determination, the court considers all relevant factors, including (1) the opportunity of the witness to view the suspect at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the suspect, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation.[20]

T.G. asserts that the showup was impermissibly suggestive because officers told Waldon that they had two suspects in custody before the identification, Waldon viewed the two suspects together, and the officers continued their interrogation after Waldon failed initially to make a positive identification. But showup identifications are not per se impermissibly suggestive merely because the witness understands that the police are holding possible suspects.[21]

As the juvenile court noted, Waldon indicated her understanding of Officer Jones's detailed admonishment that she was not obligated to identify anyone and

---

[19] State v. Rogers, 44 Wn. App. 510, 515-16, 722 P.2d 1349 (1986) (citing Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)).

[20] Linares, 98 Wn. App. at 401; Neil v. Biggers, 409 U.S. 188, 198-200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

[21] Guzman-Cuellar, 47 Wn. App. at 336 (defendant standing handcuffed and about 15 feet from police car did not render showup unnecessarily suggestive).

that the showup procedures should not influence her judgment. Waldon emphasized that she did not want to make a positive identification until she was certain. Waldon paid no particular attention to Jones's actions after he left the car. Although she saw that the officers had contact with T.G. and D.G. after Jones left the car, that interaction was brief and noncoercive. Nothing in the record suggests that the officers or the circumstances of the investigation exerted any direct or indirect pressure on Waldon to make the identification.

The evidence also supports the court's determination that the identification procedure was reliable despite any suggestiveness. First, Waldon was only two feet away from the kitchen window, where the two suspects stood. The blinds were down, but the slats were positioned horizontally, giving her a relatively unobstructed view of both boys' faces.

Second, although Waldon estimated she saw the suspects for only about three seconds, an estimate that the court found credible, she was able to note their facial expressions, relative positions, and the attempt to slide open the window. Waldon acknowledged that she focused on the suspect later identified as D.G., but she insisted that she also "got a reasonable identifying look" at T.G.

Third, contrary to T.G.'s assertions, Waldon provided a reasonably accurate description of the suspects, including their age, height, general build, and complexion. Waldon also observed that at least one of the boys had a

backpack. Although she erroneously described D.G. as Asian, she explained that the 911 operator had suggested this as a possibility. Waldon emphasized that she was attempting to describe the slightly darker complexion of one of the suspects. Minor discrepancies do not negate the general accuracy of Waldon's description or preclude admissibility of her identification.[22]

Fourth, Waldon called 911 at 9:50 a.m., shortly after the boys fled. Officer Ross contacted T.G. and D.G. at 10:03 a.m. No more than 30-35 minutes elapsed between Waldon's view of the boys and her identification.[23]

Finally, when Waldon viewed the suspects at a closer distance through the cleared windshield, she recognized them immediately and stated that she was "100 percent sure."

Viewed together, the foregoing circumstances supported the juvenile court's determination that Waldon's identification was reliable and admissible.

T.G.'s reliance on the testimony of Dr. Loftus is misplaced. Loftus identified the general circumstances and situations that may render identifications unreliable, but he did not review or address the specific factors of Waldon's identification. The juvenile court carefully considered his testimony and noted that several circumstances here, including the relative safety of Waldon's

---

[22] See Manson, 432 U.S. at 116-17 (weight to be given identifications with some questionable features is for the trier of fact).

[23] See Rogers, 44 Wn. App. at 516 (6-hour delay between incident and showup was within permissible range).

viewing point, the lack of direct physical contact with the suspects, and the absence of significant post-event memory contamination, differed from those that Loftus characterized as unreliable. Under the circumstances, the weight to be accorded his testimony was an issue of credibility that this court cannot review.[24]

T.G. also suggests that the juvenile court failed to give proper consideration to the cross-racial aspects of Waldon's identification.[25] But Waldon's identification of T.G. was not a cross-racial identification. Nothing in the record supports T.G.'s claim that Waldon's view of both suspects together in the showup made it more "likely that the cross-racial risks of misidentifying D.G. carried over to T.G."

Affirmed.

_Leach, J._

WE CONCUR:

---

[24] See State v. Walton, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992) (appellate court defers to trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence).

[25] See generally State v. Allen, 176 Wn.2d 611, 294 P.3d 679 (2013).