IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36647-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| TERRY LEE RUSSELL, JR., | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Terry Russell appeals his conviction for residential burglary. He contends a photomontage showed to a victim violated his due process rights. We disagree and affirm his conviction. We remand for the striking of some legal financial obligations.

## FACTS

This prosecution arises from a burglary at the Pederson family Tacoma home on February 1, 2016. Appellant Terry Russell denies he burglarized the home. We glean the facts from trial testimony.

Terry Russell is a self-employed general contractor.  He subcontracts for restoration work with individual homeowners.  In February 2016, Terry Russell performed construction work at a Tacoma home on 51st Street.  Russell insists that, on Monday, February 1, 2016, the day of the crime, he was flattening the structure on 51st Street.

According to Terry Russell, before starting the 51st Street home job, he introduced himself to neighbors and told them the window of time for the project.  All neighbors kindly received Russell except next door neighbor, Brandon Tally.  Unbeknownst to Terry Russell, Tally took surveillance pictures of him while Russell toiled at the 51st Street home.

Lindsey Pederson lived with her father, stepmother, and stepbrother on North Pine Street in Tacoma, five miles from the 51st Street home where Terry Russell worked.  On February 1, 2016, at 11:40 a.m., Lindsey returned home after a weekend trip to Seattle. Her father and stepmother were then at work and her stepbrother at school.  The father, Eric, locked all doors to the outside when he left for work that morning.

After briefly parking at her residence, Lindsey Pederson drove to a nearby convenience store, for snacks and a beverage, one or two minutes away.  As she drove on North Pine Street, Lindsey saw a Toyota van driving in the opposite direction.  Due to the road's narrowness, the driver of the van pulled to the side to allow Lindsey to pass.  As she waved at the driver to express thanks, she observed a person in the passenger seat of

2

the van.  After buying a drink and candy, Lindsey drove back to her residence.

When Lindsey Pederson arrived home the second time, she noticed the same Toyota van parked in her father's parking spot to the residence's right.  Lindsey assumed the van occupants were visiting neighbors.  As she walked toward the house, she heard the van's engine running, but she did not look inside the vehicle.  The front door to the house was locked, and, as she peered through the door's window, she saw a French door at the back of the house ajar.  Since her family does not leave the house unlocked, Lindsey grew troubled.  Lindsey unlocked the front door, went to the back French doors, and saw shattered glass from one of the doors.

After surveying the damage, Lindsey Pederson heard footsteps upstairs.  Lindsey uttered "hello" and heard quickened footsteps.  She called "hello" again, but only heard more footsteps. Report of Proceedings (RP) (Jan. 22, 2018) at 21.  Lindsey, from fear, exited the front door of her house.  Before she reached the end of the front porch, a man jumped from the residence's roof and landed in front of her.  The housebreaker had removed a screen on Lindsey's stepbrother's window and climbed on the roof.  The man faced Lindsey and looked at her.  He immediately bolted to the van.  Lindsey noticed the trespasser being of "average male height," which she believes to be five foot eight inches. RP (Jan. 22, 2018) at 23.  The intruder wore mismatched gloves, a black beanie hat, dark pants, and a dark or black sweatshirt.  Despite a limited view due to the beanie, Lindsey saw darker hair.

3

The intruder climbed into the driver's seat of the van and began his escape. The man shifted the van in reverse and backed out of the driveway and down North Pine Street. Lindsey Pederson took pictures of the van with her phone. The van lacked a license plate. Due to glare on the van's windshield, Lindsey could not photograph the van's occupants. Lindsey, however, observed a blond woman "scrunched" in the passenger seat. The van crashed into a neighbor's vehicle, before backing down the street and leaving the neighborhood. Lindsey went to a neighbor's house and called the police and her father.

Eric Pederson, Lindsey's father, immediately returned home. Eric and Lindsey entered the residence and surveyed the premises. The home breaker only disturbed the second floor master bedroom. He had strewn belongings, including papers and jewelry kept on Eric's wife's side table, onto the bed. The intruder also placed drawers taken from dressers and their contents on the bed.

While Lindsey and Eric Pederson awaited police, Lindsey posted a picture of the van and the shattered French door to her Facebook page. In her post, Lindsey commented about the need to jail the perpetrators and pledged not to allow them to succeed in their crime.

Tacoma Police Department Officer Rick Hutchinson journeyed to the Pederson home. Officer Hutchinson interviewed Lindsey, obtained a description of the suspect, and scrutinized the house. Lindsey described the suspect as a white male, age twenty to

4

twenty-five, with brown hair.

On February 2, 2016, Brandon Tally contacted Lindsey Pederson on Facebook regarding the burglary of the Pederson residence. Tally sent her a photo of Terry Russell and asked if the person in the photo committed the burglary. Lindsey's gut instinct told her that the pictured person was the burglar. Lindsey looked at the picture "once or twice" and "didn't look at it for very long." RP (Jan. 22, 2018) at 46. Brandon Tally then gave her the name Terry Russell, a name unfamiliar to her.

Also on February 2, 2016, Brandon Tally contacted Tacoma Police Detective Christine Coulter regarding the intrusion at the Pederson home. Tally identified, for Detective Coulter, "Terry Russell" as a potential suspect in the burglary, and he e-mailed her pictures of the suspect. Tally also sent Detective Coulter photos of a Nissan Sentra that he claimed to be associated with Terry Russell.

On February 25, 2016, Detective Christine Coulter contacted Lindsey Pederson. At the police station, Lindsey looked at a series of six photos of men to attempt to identify the trespasser. All photographs were in color and of the same size, showing men in the same front face format. Half of the men had facial hair. Detective Coulter did not tell Lindsey that she included the photograph of Russell in the montage. The photomontage contained an admonition, signed by Lindsey, which read:

> "You are about to view a group of photos for the purpose of identifying a suspect in a crime. The fact that the photographs are shown to you should not influence your judgment. This group of photographs may

5

or may not include a photograph of the person who committed this crime. Therefore, you should not conclude or guess. You are not obligated to identify anyone. Keep in mind that a photograph may or may not depict the current appearance of the person who committed the crime since the people can change their appearance in numerous ways. Also photographs do not always show the true complexion of a person who could be lighter or darker than shown. Finally, please do not discuss this case with other witnesses, nor indicate in any way that you have or have not identified anyone."

RP (Jan. 22, 2018) at 42-43; Ex. 12.

After signing the admonition form, Lindsey Pederson viewed the six pictures displayed in the photo mosaic. Lindsey concluded that all photographed men were in their twenties, thirties, forties, and that they all looked similar in age. Lindsey first excluded pictures three to six from consideration. Lindsey struggled between photographs one and two. She tried to imagine the man in photograph two without his mustache. She viewed the men in photos one and two as similar in that they both had light eyes and similar color of hair. After viewing the photographs for less than one minute, Lindsey identified the first picture as the individual who committed the burglary. Terry Russell was pictured in the montage's first photo. In a written statement to law enforcement, Lindsey wrote: "I am 100% positive this is the same man whom landed in front of me after attempting to rob me." Ex. 12.

PROCEDURE

The State of Washington charged Terry Russell with one count of residential burglary based on the February 1, 2016 intrusion into the Pederson abode. Before trial,

Russell moved the court to exclude from evidence, under ER 401 and ER 403, Lindsey Pederson's identification from the photo montage and any in-court identification. The trial court denied Russell's motion in limine.

At trial, Terry Russell denied committing the burglary and denied being in the Pederson neighborhood on February 1, 2016. Russell testified that he did not possess a car and often relied on the homeowner of the house where he worked for transportation. He averred that he did not receive a ride in a minivan in February 2016 and that a friend, Anastasia, from whom he often gets rides, owns a Nissan Sentra, not a van. He also testified that he might have received a ride, from Anastasia, from his father's house to work at the house in south Tacoma on February 1. Russell denied knowing the locale of the Pederson home, denied ever having seen the Pedersons, and denied entering their house. In addition, Russell denied dyeing his hair or changing his facial hair.

During trial, Lindsey Pederson testified that she sought to keep an open mind when viewing the law enforcement photomontage and to render her identification based on observations at her home on February 1, not on the picture sent her by Brandon Tally. She concluded that she would recognize the burglar if she ever faced him again. During trial, Lindsey identified Terry Russell in court as the man who jumped from the roof of the house.

The jury found Terry Russell guilty of residential burglary. At sentencing, the trial court imposed legal financial obligations consisting of a $500 crime victim penalty

assessment, a $100 DNA database fee, and a $200 criminal filing fee. The trial court declared Russell indigent for purpose of this appeal.

LAW AND ANALYSIS

On appeal, Terry Russell assigns error to the trial court's denial of his motion in limine. He claims that Lindsey Pederson's identification of him in the series of photographs violated his due process rights because the identification resulted from an impermissibly suggestive or tainted photomontage. He emphasizes that Pederson had earlier viewed the picture sent to her by Brandon Tally, to which Tally identified the pictured man as Terry Russell. Russell also, putting aside the photos sent by Tally to Pederson, challenges the method by which law enforcement displayed the six photographs to Pederson.

We review a trial court's decision on whether to admit an out-of-court identification, including a photomontage, for abuse of discretion. *State v. Kinard*, 109 Wn. App. 428, 432, 36 P.3d 573 (2001). An out-of-court photographic identification meets due process requirements if it is not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968); *State v. Kinard*, 109 Wn. App. at 432-33.

To determine whether a photo identification is so impermissibly suggestive that it creates a substantial likelihood of irreparable misidentification, courts employ a two-step

test. *State v. Kinard*, 109 Wn. App. at 433. The accused must first show that the identification procedure was suggestive. *State v. Kinard*, 109 Wn. App. at 433. If the defendant cannot show that the identification procedure is suggestive, the inquiry ends. *State v. Linares*, 98 Wn. App. 397, 401, 989 P.2d 591 (1999). A suggestive identification procedure unduly calls attention to a particular photo. *State v. Linares*, 98 Wn. App. at 403. If the defendant carries this burden, the court must then determine whether, considering the totality of the circumstances, the suggestiveness created a substantial likelihood of irreparable misidentification. *State v. Linares*, 98 Wn. App. at 401. Traditionally, courts consider:

> (1) the opportunity of the witness to view the [suspect] at the time [of the crime]; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description . . . ; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the [offense] and the confrontation.

*State v. Barker*, 103 Wn. App. 893, 905, 14 P.3d 863 (2000).

Due process principles regarding suggestive photograph identifications have no application to pretrial photographic identification procedures engaged in by private citizens. *State v. Knight*, 46 Wn. App. 57, 59, 729 P.2d 645 (1986). This rule is premised on the principle that evidence obtained by a private citizen using illegal means will be suppressed only when the State in some manner instigated, encouraged, counseled, directed, or controlled the conduct. *State v. Knight*, 46 Wn. App. at 59-60.

We readily dismiss Terry Russell's contention that the photograph and message sent by Brandon Tally violated Russell's due process rights by tainting the later identification during the law enforcement photomontage. The law does not impute Tally's conduct to the State. One might conclude that, in concern of fairness for the accused, a court may consider the impact that photographs displayed by a private citizen to a victim might have on a victim that later views pictures at the request of law enforcement. *State v. Knight* suggests otherwise. Nevertheless, even if we considered the combination of Brandon Tally's photograph and the photo mosaic shown by law enforcement, we would still conclude that the procedure was not overly suggestive.

Terry Russell acknowledges *State v. Knight*, but argues that *Knight* leaves the ability to challenge the photomontage by itself. We agree and also analyze the methodology employed solely by law enforcement.

Courts have found out-of-court identifications to be impermissibly suggestive when the defendant is the sole possible choice given the witness's earlier description. *State v. Ramires*, 109 Wn. App. 749, 761, 37 P.3d 343 (2002). Nevertheless, minor differences in the photos are not suggestive enough to warrant further inquiry into the likelihood of misidentification. *State v. Eacret*, 94 Wn. App. 282, 285, 971 P.2d 109 (1999). Courts also consider (1) whether the police displayed only the picture of a single individual who generally resembles the person the witness saw, (2) whether one picture is emphasized, and (3) whether the police indicated to the witness that they have other

evidence that one of the persons pictured committed the crime.  *Simmons v. United States*, 390 U.S. at 383-84 (1968).

Terry Russell argues that the photomontage presented by law enforcement to Lindsey Pederson was not reliable because Lindsey saw the picture of Russell sent by Brandon Tally soon after the burglary.  Nevertheless, Russell makes no argument as to how the photomontage itself, displayed by Detective Christine Coulter to Lindsey, is impermissibly suggestive.

Law enforcement showed Lindsey Pederson six photographs.  Police did not suggest to Pederson that the photographs were in any order.  Differences between the men in the six photographs were minimal.  Lindsey Pederson thought them to be the same age.  She particularly struggled between photographs one and two, who had light eyes and the same color of hair.  Law enforcement never suggested to Pederson that any other evidence connected Terry Russell or the man pictured in photograph one to the burglary.  No officer told Pederson that the burglar's photograph was in the montage.

Assuming we consider the earlier photo sent by Brandon Tally, Lindsey Pederson still carefully reviewed six photographs.  She knew she could have concluded that none of the photographs fit her home trespasser.

We conclude that the photomontage was not impermissibly suggestive.  Therefore, we do not reach step two of the two-step test, whether, considering the totality of the circumstances, the suggestiveness created a substantial likelihood of irreparable

11

misidentification.  The trial court did not abuse its discretion in admitting the photomontage, and, therefore, this court should affirm Russell's conviction for the crime of residential burglary.

## Legal Financial Obligations

The trial court assessed legal financial obligations at sentencing of a $500 victim penalty assessment fee, a $200 criminal filing fee, and a $100 DNA fee.  Although mandatory when imposed, the criminal filing fee and DNA fee are no longer mandatory under new legislation as explained in *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018).  The DNA fee is mandatory if the offender has yet to have his DNA collected by the State.

Pursuant to *Ramirez*, we remand for the trial court to strike the DNA collection fee, assuming Terry Russell has prior convictions, and the criminal filing fee.  Russell need not be present at any hearing to strike the financial obligations.

## CONCLUSION

We affirm Terry Russell's conviction of burglary.  We remand for the striking of some of the legal financial obligations.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Pennell, J.