IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37124-7-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| HAVEN MARY SCABBYROBE, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Haven Scabbyrobe appeals her conviction for theft of a motor vehicle. She argues she received ineffective assistance of counsel because trial counsel failed to move to suppress the victim's showup identification of her. We disagree and affirm.

FACTS

Jeffery Huff left his car running in his driveway early one mid-November morning. From inside his house, he saw his car backing away. Huff hurried outside and saw a woman inside his car. The woman backed into a telephone pole and large rock, the latter interfered with her driving away.

Huff was able to get into his car through the front passenger door and yelled for the woman to get out. She said she was unable to, and Huff noticed that a mailbox blocked the driver's side door from opening. He also noticed a dark tattoo on the top of her left hand. Huff directed the woman to crawl over him. Once out, she began to dig in

her pockets. Huff thought she might be looking for a weapon, so he told her if she pulled out anything he would knock her out. The woman then left, walking very fast down the road, then turning down a second road and out of sight.

Huff called 911 and Sergeant Joseph Vanicek responded within one or two minutes. Huff described the woman as a Hispanic female with long dark hair, wearing a black coat, and carrying two backpacks. Sergeant Vanicek forwarded this description to other officers, including Officer Damon Dunsmore, who was in the area.

A few minutes later, Officer Dunsmore saw a woman running and looking behind her. She was wearing basketball-style shorts, no coat, and open toe sandals. Because she was not properly clothed for the near freezing temperature and because her shoes did not suggest she was exercising, Officer Dunsmore stopped her and alerted Sergeant Vanicek that he had a woman who might be the suspect.

Huff accompanied Sergeant Vanicek to Officer Dunsmore's location. While en route, Sergeant Vanicek said, "just because [you are] going to look at a female suspect, it doesn't necessarily mean it [is your] suspect." Clerk's Papers (CP) at 82.

When they arrived, Huff saw a woman in handcuffs standing next to an officer, both about 30 to 40 feet away. Huff noticed that the woman was not wearing the same clothes, did not have any backpack, and her hair was up instead of down. Nevertheless,

2

he identified the woman with "100 percent" confidence as the one who had tried to steal

his car. Report of Proceedings at 282, 311. Huff also said the woman should have a

tattoo on the top of her hand. Officer Dunsmore looked at the woman's hand and said she

did have a tattoo on the top of her hand.

The woman, Scabbyrobe, identifies as Native American, not Hispanic. She also

had a smaller-than-pupil-sized green heart tattoo under her right eye, and a nearby small

mark that might have been an old tattoo.

The State charged Scabbyrobe with theft of a motor vehicle. During the State's

case-in-chief, Huff again identified Scabbyrobe as the woman who tried to steal his car.

Defense counsel elicited from Huff that he had not noticed anything distinctive about the

thief's face.

During closing, defense counsel argued Scabbyrobe was not the same woman Huff

had seen in his car. The defense emphasized that Scabbyrobe was wearing different

clothes than the thief, she was not carrying two backpacks, and she had a distinctive

tattoo on her face. The State argued that Scabbyrobe, trying not to be caught, may have

discarded or hidden her coat, pants, and backpacks before she was seen by Officer

Dunsmore.

3

The jury deliberated for two to three hours and declared they were at an impasse. The trial court directed them to continue deliberating. Eventually, they returned a guilty verdict. Scabbyrobe timely appealed.

ANALYSIS

Scabbyrobe contends her trial counsel was ineffective for not moving to suppress the showup identification.

A criminal defendant is entitled to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, section 22; *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018). To show ineffective assistance of counsel, a defendant must show that counsel's representation was deficient, and the deficiency was prejudicial. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). In order to show actual prejudice "by counsel's failure to move for suppression, [a defendant] must show the trial court likely would have granted the motion if made." *Id.* at 333-34.[1]

---

[1] Where a motion to suppress is not made, appellate courts must examine the trial record to determine if a motion to suppress likely would have been granted. Trials often focus on different facts and issues than a motion to suppress. In those instances where the trial record is insufficient, ineffective assistance claims are rejected on the basis that the defendant cannot establish that he or she was prejudiced by counsel's failure to bring a suppression motion. *McFarland*, 127 Wn.2d at 337-38.

At trial, both sides focused on the reliability of Huff's identification of Scabbyrobe. As discussed below, the reliability of Huff's identification is the lynchpin for our determining whether the trial court would have granted or denied a motion to

SUPPRESSION OF IDENTIFICATION

A due process challenge to a pretrial identification procedure is a two-step inquiry.

A defendant asserting that a police identification procedure denied him or her due process

must first show that the procedure was unnecessarily suggestive. *Foster v. California*,

394 U.S. 440, 442, 89 S. Ct. 1127, 22 L. Ed. 2d 402 (1969). If such a showing is made,

the court will consider the totality of the circumstances to determine whether the

suggestiveness created a substantial likelihood of irreparable misidentification. *Manson*

*v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

*First step—not unnecessarily suggestive*

Scabbyrobe argues the showup procedure used here was impermissibly suggestive

because it focused on one person—a person selected based on Huff's description of her.

We disagree.

The procedure used here did not run afoul of what courts have generally

recognized to be impermissibly suggestive procedures. "Generally, courts have found

lineups or montages to be impermissibly suggestive solely when the defendant is the only

---

suppress. Because the focus at trial and on appeal are the same, we believe the record is
sufficient for us to review Scabbyrobe's ineffective assistance claim.

    The dissent might disagree and repeatedly emphasizes there are several unknown
facts. If so, the proper remedy would be to deny review and to suggest that Scabbyrobe's
remedy is to file a personal restraint petition. *Id.* at 338.

possible choice given the witness's earlier description." *State v. Ramires*, 109 Wn. App. 749, 761, 37 P.3d 343 (2002; *State v. Burrell*, 28 Wn. App. 606, 611, 625 P.2d 726 (1981) (suspect described as having "frizzy Afro" hairstyle; defendant was the only subject in montage with that distinctive characteristic). Here, had police told Huff the suspect was stopped because she was running in open toe sandals, this detail could have impermissibly suggested she was the thief. Instead, police suggested the opposite by telling Huff, "just because [you are] going to look at a female suspect, it doesn't necessarily mean it [is your] suspect." CP at 82.

We have previously recognized a "prompt identification procedure frequently demonstrates good police procedure [because it] best guarantees freedom for innocent subjects." *State v. Bockman*, 37 Wn. App. 474, 482, 682 P.2d 925 (1984). Here, had Officer Dunsmore arrested Scabbyrobe prior to Huff positively identifying her, this would have been an unconstitutional seizure. For all Officer Dunsmore knew, the woman he stopped may not have been the thief. A showup identification was a proper procedure to protect Scabbyrobe's constitutional right from an unconstitutional seizure and to ensure her prompt release had Huff not identified her as the thief.

Scabbyrobe argues that Officer Dunsmore could have taken her picture, released her, and sometime later shown Huff her picture in a photomontage with other women.

6

We agree that Officer Dunsmore could have done that. But simply because a different procedure could have been used does not mean the procedure actually used was impermissibly suggestive. The "admission of evidence of a showup without more does not violate due process." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

We conclude that the showup procedure used here was not unnecessarily suggestive. For this reason, the trial court likely would have denied a motion to suppress and defense counsel was not ineffective for failing to bring such a motion.[2]

*Second step—no substantial likelihood of irreparable misidentification*

We address the second step of the two-step inquiry so Scabbyrobe can be assured she did not receive ineffective assistance of counsel.

In *Manson*, the court eliminated a line of federal case law that required the per se exclusion of pretrial identification through unnecessarily suggestive identification procedures. *State v. Vaughn*, 101 Wn.2d 604, 608, 682 P.2d 878 (1984). The *Brathwaite* court held that reliability was the linchpin for admissibility and required that the

---

[2] In its brief, the State argued that Ms. Scabbyrobe could not establish the first step. Resp't's Br. at 6-11. During oral argument, the State retreated from this position. We agree with its briefed position and are not bound by its erroneous retreat during oral argument. *See State v. Bacon*, 190 Wn.2d 458, 463 n.4, 415 P.3d 207 (2018) (a reviewing court is not bound by a party's erroneous concession of law).

7

corrupting effect of the suggestive identification be balanced against certain factors indicating reliability. *Id.* at 607-08. These factors, often referred to as the *Biggers* factors, are (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. *Biggers*, 409 U.S. at 199-200; *see also Vaughn*, 101 Wn.2d at 608.

*Application of the* Biggers *factors*

First, Huff had the opportunity to view the thief up close during the crime. One does not need to see a person for longer than one minute to recognize the person 10 minutes later. This factor weighs in favor of admissibility.

Second, Huff paid attention to the thief. He focused on her and only her for a couple of minutes. This factor also weighs in favor of admissibility.

Third, Huff's description of the thief differed somewhat from Scabbyrobe. He identified her as Hispanic, but Scabbyrobe identifies as Native American. He said she would have a tattoo on the top of her hand and she did; but he did not notice the very small tattoo under her right eye or the nearby small faded mark. With respect to clothes, this is not determinative. Although Scabbyrobe was not wearing pants and a coat, she

8

was wearing shorts and open toe sandals—inappropriate clothes for running in the cold. This suggests, as the State argued below, that Scabbyrobe discarded her coat and pants. It is unlikely that Scabbyrobe was running for exercise, given that she was looking behind her as she ran and was running in open toe sandals. It is also unlikely there would be two women in the same area moving quickly on foot with a tattoo on the top of their hand. If one believes that Scabbyrobe had discarded her pants and coat, a belief presumably favored by the unanimous jury, this factor weighs in favor of admissibility.

Fourth, Huff identified Scabbyrobe as the thief and was 100 percent sure. This factor weighs in favor of admissibility.

Finally, less than 10 minutes passed between the time of the crime and the confrontation. This factor also weighs in favor of admissibility.

In all, the *Biggers* factors support admitting the showup identification. We conclude the trial court likely would have denied a motion to suppress had one been filed, and, therefore, reject Scabbyrobe's ineffective assistance of counsel claim.

No. 37124-7-III
*State v. Scabbyrobe*


Affirmed.[3]

                                        _____
                                        Lawrence-Berrey, J.

I CONCUR:


_____
Siddoway, A.C.J.


---

[3] The dissent writes at length about implicit bias and ponders whether implicit bias led to Scabbyrobe's arrest and conviction. We searched the record and found no credible evidence of this: Huff identified Scabbyrobe with 100 percent certainty, and his certainty was buttressed when Officer Dunsmore confirmed the tattoo on the top of Scabbyrobe's hand. Based on this certainty, law enforcement arrested her. There is no evidence her arrest was tainted by implicit bias. The prosecutor's office properly charged Scabbyrobe based on the evidence. There is no evidence her charge was tainted by implicit bias. The jury conscientiously deliberated. There is no evidence the jury's verdict was tainted by implicit bias. There are no challenged evidentiary rulings, and the trial court sentenced Scabbyrobe just under the mid-range sentence given the charge and her offender score. There is no evidence the trial judge's discretionary decisions were tainted by implicit bias.

Implicit bias exists. Law enforcement, prosecutors, trial judges and appellate judges must be aware of this and guard against it. But we must not be so guarded that we overturn verdicts where no credible evidence exists that implicit bias tainted the outcome.

10

No. 37124-7-III

FEARING, J. (dissent) —

*The annals of criminal law are rife with instances of mistaken identification.*  United States v. Wade, *388 U.S. 218, 228, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967).*

Facts favoring Haven Scabbyrobe clashing with facts favorable to the State, eyewitness Jeffery Huff's description of the culprit conflicting with the features of Haven Scabbyrobe, confusion in Jeffery Huff as to the ethnicity of Haven Scabbyrobe, Scabbyrobe's failure to move to suppress the showup eyewitness identification before the trial court, vague standards that apply to the admissibility of eyewitness identification testimony, deference granted to the trial court when admitting eyewitness identification testimony, the law's failure to advance in light of scientific or psychological studies about memory, the State's implied concession to the suggestiveness of the showup, the calamity of false convictions based on eyewitness misidentification, an even higher rate of cross-racial misidentifications, a message from Haven Scabbyrobe's jury of an impasse, and a

proclamation from the Washington Supreme Court for judges to recognize and resist

racial bias compound and confound resolution of this appeal.

FACTS

I take the facts from trial testimony. An intruder entered the driver's side of the

Subaru Legacy idling in Jeffery Huff's driveway. The car moved backward as Huff

watched from his residence's front window. Huff pursued his car and its driver, until the

Legacy struck a telephone pole and stopped. Huff opened the passenger door and entered

the Subaru. A female sat in the driver's seat.

A startled Jeffery Huff ordered the female out of his car. The women's face

expressed shock and fright. She could not exit the Subaru from the driver's side because

a mailbox blocked the driver's side door. Huff yelled at the woman to crawl over him

and exit through the passenger door. She complied.

No one testified at trial to the amount of time that passed between when Jeffery

Huff entered the car and the woman exited the car. We can assume that Huff saw the

female's face for at least a fleeting moment inside the car because Huff observed the

shock and fear on the woman's physiognomy. We do not know if Huff saw her face as

she hurriedly exited the car.

After exiting the Subaru Legacy, the woman stood outside the car. She abandoned

two bags in the driver's seat. Jeffery Huff grabbed the two bags and also exited the

vehicle. The female looked at Huff as he exited the passenger seat. Huff deposited the

bags on the ground. He stood ten feet from the woman.

The woman placed her hands in both pockets. Jeffery Huff warned her that he would harm her if she pulled any object from a pocket. The female grabbed her two bags and quickly walked away. She did not run or jog.

The record does not indicate how long the woman looked at Jeffery Huff as he departed from his Subaru or the extent to which Huff viewed the woman's face as she stood near his car. According to Huff, the culprit stood outside his Subaru for a couple seconds to thirty seconds.

Jeffery Huff had never seen the woman before. He, however, observed that she wore dark sweatpants and a dark coat. Her hair was dark. When he first saw the female in the car, Huff noticed a tattoo on the top of her left hand. He could not later describe the tattoo. Huff noticed no other tattoos on the woman's body. He recalled no distinctive features about the culprit's face.

Jeffery Huff called the police. When Sergeant Joseph Vanicek arrived at Huff's residence, Huff informed the sergeant that the female wore a dark coat and sweatpants and she carried two bags. Sergeant Vanicek testified that Huff identified the female as being Hispanic, but Huff later denied informing the sergeant of any race. We do not know if Vanicek relayed the description given to him by Huff to other officers.

When Jeffery Huff spoke with Sergeant Joseph Vanicek, Huff did not describe the skin or facial features of the female to the sergeant. He did not mention the female's hair length or whether she wore her hair up or down. He did not describe what, if any, makeup the culprit wore. Huff did not describe the bags. He gave no description of the

3

female's shoes and did not mention whether she wore a hat or mittens. Huff gave no description of the culprit's height, weight, or build.

Sergeant Joseph Vanicek testified at trial that, when he interviews an eyewitness to a crime, he seeks as much information as possible. He desires as accurate a description of the culprit as possible. Vanicek typically asks a witness to estimate the suspect's height, weight, and build. He usually inquires, from any eyewitness, about distinguishing features such as scars, moles, and tattoos. Vanicek questions how long the witness observed the suspect. Nevertheless, Sergeant Vanicek never asked Jeffery Huff about any of these details that he asks other eyewitnesses to a crime.

Officer Damon Dunsmore responded to a dispatch to apprehend the culprit. The message from dispatch sent to Dunsmore and other officers indicated that the suspect was a female Hispanic, who wore a black coat and carried two backpacks. Officer Dunsmore received no description of shoes or other information about the suspect's clothes.

As he patrolled, Officer Dunsmore saw a female running, while looking back. At some point, the female stopped running. She carried no bags. According to Dunsmore, the female wore a black shirt and black long shorts. She wore open toed shoes with socks. The temperature was 34 degrees. Officer Dunsmore summoned the woman to his patrol car. She complied. The detained woman was Haven Scabbyrobe.

About five minutes after arriving at Jeffery Huff's residence, Sergeant Joseph Vanicek received a call from Officer Damon Dunsmore who informed Vanicek that he had detained someone who might be the culprit. Sergeant Vanicek did not know the

4

distance between Jeffery Huff's home and the location of the apprehended woman, other than the distance was not "super-far." Report of Proceedings at 303.

Sergeant Joseph Vanicek drove Jeffery Huff to the location where Officer Damon Dunsmore detained a cooperative Haven Scabbyrobe. During the journey, Sergeant Vanicek advised Huff that, just because the other officer had stopped someone, did not mean the person was the thief of his car.

On the arrival of Vanicek and Huff, fully uniformed Officer Damon Dunsmore and Haven Scabbyrobe stood next to one another and adjacent to a fully marked police cruiser. As Jeffery Huff sat in Sergeant Vanicek's car, he identified Scabbyrobe, from thirty to forty-five feet away, as the culprit. As he looked toward Scabbyrobe, Huff said the woman would have a tattoo on her hand. He had not earlier told Vanicek of any tattoo. Huff stated that, when he saw the female earlier, her hair was down, but now it was up. We do not know how long Huff looked at Scabbyrobe at the spot of her detention.

When detained, Haven Scabbyrobe's hair reached her shoulders. She bore an eyeball sized green heart tattoo under her right eye. Scabbyrobe also displayed a tattoo toward her hair line. Jeffery Huff had not previously observed any tattoos or marks on the female culprit's face.

Law enforcement did not show Jeffery Huff any persons other than Haven Scabbyrobe. When identifying Haven Scabbyrobe as the culprit, Huff declared that he was one hundred percent certain. Twenty minutes passed between the time that Jeffery

Huff saw his car exiting his driveway until he identified Haven Scabbyrobe at the location of her detainment.

After taking Haven Scabbyrobe to the police station, Officer Damon Dunsmore returned to the area of detainment to search for backpacks and discarded clothing. He found none. He noticed a garbage truck leaving the vicinity, although he did not view the truck emptying any garbage cans. In his police report, Dunsmore did not mention returning to the neighborhood to search for bags or clothes.

During a later interview with defense counsel, Jeffery Huff stated that the culprit was Hispanic and that her hair fell below her shoulders. He stated that, once he told the culprit to leave, she remained standing in place for only a couple seconds.

We do not know the acuity of Jeffery Huff's vision. We do not know if he wore glasses or contacts. As far as we know, Huff lacked any training similar to training given to police officers about memorizing features of other human beings. Law enforcement collected no DNA, hair, or fingerprints from Jeffery Huff's car.

Haven Scabbyrobe did not call any expert witness during trial to inform the jury of the vagaries of eyewitness identification evidence. He did not submit a jury instruction warning the jury of such vagaries.

After two and one-half hours of deliberation, the jury wrote to the trial court that it was at an impasse in reaching a verdict. The court directed the jury to continue deliberating. The jury thereafter convicted Haven Scabbyrobe of theft of a car.

During oral argument before this court, the State's counsel commented:

> The issue here is reliability. And I don't know that the State can argue that there isn't a suggestive element to this type of showup procedure. I mean, I think that is what the Court said in [*Manson v.*] *Brathwaite* [, 432 U.S. 98, 97 S.Ct. 2243, 53 L. Ed. 2d 140 (1977)].

Wash. Court of Appeals Oral Argument, *State v. Scabbyrobe*, No. 37124-7-III (Jan. 26, 2001), at 13. min., 7 sec. to 13. min., 23 sec. (on file with court).

CONSTITUTIONAL UNDERPINNINGS TO EYEWITNESS CHALLENGES

Many criminal prosecutions are based, at least in part, on eyewitness identification. Heather D. Flowe et al., *The Role of Eyewitness Identification Evidence in Felony Case Dispositions*, 17 PSYCHOL., PUB. POL'Y & L. 140, 150 (2011). Historically, our criminal justice system has placed great value on such evidence. Taki V. Flevaris & Ellie F. Chapman, *Cross-Racial Misidentification: A Call to Action in Washington State and Beyond*, 38 SEATTLE U.L. REV. 861, 866 (2015). In many prosecutions, such as the prosecution of Haven Scabbyrobe, eyewitness identification represents the primary or only evidence of guilt.

The accused may challenge eyewitness identification testimony, under ER 602, based on a lack of foundation or absence of personal knowledge. Nevertheless, the accused generally relies on the due process clause of the United States Constitution's Fourteenth Amendment, and courts generally employ due process principles when reviewing the admissibility of eyewitness identification testimony. *State v. Vaughn*, 101 Wn.2d 604, 611-12, 682 P.2d 878 (1984). The United States Supreme Court has held that the procedures employed during a corporeal identification and the reliability of an

eyewitness identification may be so defective as to deny the accused due process of law under the Fourteenth Amendment. *Perry v. New Hampshire*, 565 U.S. 228, 238-39, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012); *Manson v. Brathwaite*, 432 U.S. 98, 104 (1977); *Foster v. California*, 394 U.S. 440, 442, 89 S. Ct. 1127, 22 L. Ed. 2d 402 (1969); *Simmons v. United States*, 390 U.S. 377, 383, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968); *Stovall v. Denno*, 388 U.S. 293, 298, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967) *abrogated by United States v. Johnson*, 457 U.S. 537, 102 S. Ct. 2579, 73 L. Ed. 2d 202 (1982); *United States v. Wade*, 388 U.S. 218, 228 (1967). This principle arises from the notion of fairness enshrined in the due process clause. *Manson v. Brathwaite*, 432 U.S. 98, 113 (1977).

Washington courts declare that an accused possesses a right to a "fair trial" under article I, section 22 of the Washington State Constitution. *State v. Hecht*, 179 Wn. App. 497, 503, 319 P.3d 836 (2014). This section of the constitution does not expressly mention a "fair trial," but the right is implied from the language "a speedy public trial by an impartial jury." WASH. CONST. art. I, § 22. No Washington defendant has based a challenge to eyewitness identification testimony on the right to a fair trial under section 22, perhaps because the notion of a fair trial overlaps with principles emanating from the due process clause.

TWO PART TEST

The United States Supreme Court employs a two-part test, sometimes known as the *Manson* test or *Brathwaite* test, for reviewing due process challenges to corporeal

identifications arranged by law enforcement. First, the defendant must show the identification procedure was impermissibly suggestive. *Manson v. Brathwaite*, 432 U.S. 98, 105 n.8 (1977); *Neil v. Biggers*, 409 U.S. 188, 197, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); *Simmons v. United States*, 390 U.S. 377, 384 (1968); *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967). If the defendant fails to meet this initial burden, the inquiry ends. If the defendant meets this burden, then the court determines whether the identification contained sufficient indicia of reliability despite the suggestiveness. Stated differently, the court must, during step two, determine whether the impermissible suggestiveness creates a "very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977); *Simmons v. United States*, 390 U.S. 377, 384 (1968). This two-part analysis applies to lineups, showups, and photo identifications. *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977); *Simmons v. United States*, 390 U.S. 377, 383-84 (1968); *Stovall v. Denno*, 388 U.S. 293, 302 (1967).

Due to extensive, if not unanimous criticism, of the United States Supreme Court test by legal scholars, some states have adopted other tests to determine the admissibility of eyewitness identification testimony by construing their respective state constitutions broader or by adopting legislation. *State v. Davis*, 2018 ME 116, 191 A.3d 1147, 1155-57 (Maine); *State v. Lawson*, 352 Or. 724, 291 P.3d 673 (2012) (Oregon); *State v. Henderson*, 208 N.J. 208, 27 A.3d 872 (2011) (New Jersey); *Commonwealth v. Johnson*, 420 Mass. 458, 650 N.E.2d 1257 (1995) (Massachusetts); *State v. Ramirez*, 817 P.2d 774 (Utah 1991); *People v. Adams*, 53 N.Y.2d 241, 423 N.E.2d 379, 383-84, 440 N.Y.S.2d

902 (1981) (New York); *State v. Leclair*, 118 N.H. 214, 218, 385 A.2d 831 (1978) (New

Hampshire); N.C. GEN. STAT. § 15A-284.52 (North Carolina); OHIO REV. CODE ANN. §

2933.83. Washington follows the United States Supreme Court two-part analysis. *State

v. Vaughn*, 101 Wn.2d 604, 607 (1984); *State v. Brown*, 128 Wn. App. 307, 312, 116

P.3d 400 (2005). No Washington appellant has suggested that the Washington

Constitution provides greater protection.

Some Washington decisions have conflated the two steps. *State v. Fortun-

Cebada*, 158 Wn. App. 158, 170, 241 P.3d 800 (2010); *State v. Alferez*, 37 Wn. App. 508,

512 n.3, 681 P.2d 859 (1984); *State v. Shea*, 85 Wn. App. 56, 59-60, 930 P.2d 1232

(1997), *abrogated by State v. Vickers*, 107 Wn. App. 960, 23 P.3d 752 (2001); *State v.

Bockman*, 37 Wn. App. 474, 481-82, 682 P.2d 925 (1984). Two decades ago, Division

Two of this court reasoned that merging the two steps afforded a clearer analysis, and the

division thereby adopted a blended test. *State v. Shea*, 85 Wn. App. 56, 59-60 (1997).

Under this amalgamation, courts weigh the suggestiveness of the procedure with the five

elements that test reliability of the identification. Four years later, Division Two recanted

and readopted the two-step analysis. *State v. Vickers*, 107 Wn. App. 960, 29 P.3d 752

(2001), *aff'd*, 148 Wn.2d 91, 59 P.3d 58 (2002). Even before *State v. Shea*, the

Washington Supreme Court had declared the two-prong test to be the law of Washington

State. *State v. Vaughn*, 101 Wn.2d 604, 610-11 (1984).

## FIRST STEP OF ANALYSIS - SUGGESTIVENESS

Under the United States Supreme Court's *Manson* test, the court first assesses

whether the identification procedure was "impermissibly suggestive." *Simmons v. United States*, 390 U.S. 377, 384 (1968). Courts disavow suggestive confrontations because they increase the likelihood of misidentification, and courts condemn unnecessarily suggestive corporeal identifications for the further reason that the increased chance of misidentification is gratuitous. *State v. Vickers*, 107 Wn. App. 960, 970-71 (2001). The defendant bears the burden of proving an identification procedure was unnecessarily suggestive. *State v. Gould*, 58 Wn. App. 175, 185, 791 P.2d 569 (1990).

Courts interchangeably employ the modifiers "impermissibly" and "unnecessarily" when assessing suggestive procedures. Nevertheless, the United States Supreme Court recently declared, perhaps without contemplating the ramifications, that due process concerns arise only when law enforcement officers' use of an identification procedure is both suggestive and unnecessary. *Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012).

Haven Scabbyrobe challenges a showup identification after one officer told Jeffery Huff that another officer detained a suspect. Scabbyrobe stood next to the second officer. Law enforcement did not present anyone else to view as is done in a lineup or with a photomontage. The practice of showing a suspect singly for purposes of identification has been widely condemned. *Manson v. Brathwaite*, 432 U.S. 98, 104 (1977); *Stovall v. Denno,* 388 U.S. 293, 302 (1967). A one-on-one confrontation presents greater risks of mistaken identification than a lineup. *Moore v. Illinois*, 434 U.S. 220, 229, 98 S. Ct. 458, 54 L. Ed. 2d 424 (1977). The law favors a lineup as more reliable and as involving less

11

risk of prejudice and misidentification. *State v. Burrell*, 28 Wn. App. 606, 609, 625 P.2d 726 (1981); *State v. Nettles*, 81 Wn.2d 205, 209, 500 P.2d 752 (1972).

In the context of showing the witness a single picture, one dissenting United States Supreme Court Justice wrote that:

> the display of a single live suspect[], for that matter [] is a grave error, of course, because it dramatically suggests to the witness that the person shown must be the culprit. Why else would the police choose the person? And it is deeply ingrained in human nature to agree with the expressed opinions of others particularly others who should be more knowledgeable when making a difficult decision.

*Manson v. Brathwaite*, 432 U.S. 98, 134 (1977) (Marshall, J., dissenting).

One wonders if Officer Damon Dunsmore and Sergeant Joseph Vanicek could have brought Haven Scabbyrobe to the police station and procured other similar looking individuals to pose with Scabbyrobe in a lineup. The State might respond that the officers lacked probable cause to detain Scabbyrobe beyond a short detention in one location. The State might further promote the utility of an immediate showup because an innocent person could be released if not identified by the victim. One also wonders if law enforcement could have photographed Scabbyrobe and later shown Scabbyrobe's photograph to Jeffery Huff along with photographs of others. The State might again respond that the officers lacked probable cause to detain Scabbyrobe during the time to arrange and execute the photoshoot and she might have fled if released after the shoot and before the display of a montage to Huff.

12

In *State v. Burrell*, 28 Wn. App. 606 (1981), this court found a photomontage identification admissible on other grounds, but ruled that the failure to show the eyewitness a photograph of people with frizzy Afro hairstyles was unnecessarily suggestive when the accused bore an Afro. In *State v. Traweek*, 43 Wn. App. 99, 103, 715 P.2d 1148 (1986), this court admitted a lineup identification under step two of the *Manson* analysis after holding that, when the suspect was described as a blond man, a lineup including only one blond man was unnecessarily suggestive. Finally, in *State v. Maupin*, 63 Wn. App. 887, 822 P.2d 355 (1992), this court ruled that a photomontage containing only one picture was unnecessarily suggestive.

Despite the dangers of a showup and analogous situations declaring lineups and photo identifications impermissibly suggestive, the United States Supreme Court and Washington courts have held that a showup is sometimes permissible, such as when law enforcement conducts one held shortly after the crime is committed and in the course of a prompt search for the suspect. *Stovall v. Denno*, 388 U.S. 293, 302 (1967); *Neil v. Biggers*, 409 U.S. 188, 197 (1972); *State v. Guzman-Cuellar*, 47 Wn. App. 326, 335, 734 P.2d 966 (1987); *State v. Booth*, 36 Wn. App. 66, 71, 671 P.2d 1218 (1983); *State v. Springfield*, 28 Wn. App. 446, 447-48, 624 P.2d 208 (1981); *State v. Kraus*, 21 Wn. App. 388, 391-92, 584 P.2d 946 (1978); *State v. Medley*, 11 Wn. App. 491, 499, 524 P.2d 466 (1974). Even the presence of a suspect in handcuffs is not enough to demonstrate that the showup procedure was unduly suggestive. *State v. Fortun-Cebada*, 158 Wn. App. 158, 170 (2010); *State v. Guzman-Cuellar*, 47 Wn. App. 326, 336 (1987).

13

One apposite decision is *State v. Guzman-Cuellar*, 47 Wn. App. 326 (1987). Luis Guzman argued that the showup conducted was impermissibly suggestive and violated his due process rights. Guzman emphasized the fact that law enforcement officers showed him to three eyewitnesses while in handcuffs standing next to a police car. Two of the eyewitnesses, David Hartshorn and James Hatch, identified Guzman as the man they saw in a tavern earlier in the evening. Hartshorn and Hatch had played pool with Guzman before the shooting, for which the State charged Guzman. This court reasoned that, since Hartshorn and Hatch based their identification on their contact with Guzman while playing pool, any suggestiveness in the showup would be harmless in regard to those witnesses. Donna Stake also identified Guzman during the showup. Stake testified that she had not seen Guzman until he appeared in the tavern doorway and fired a gun. This court concluded that the showup was unnecessarily suggestive as to Stake. Jeffery Huff saw the thief of his car for a measure of time somewhere in between the window of time during which Hartshorn and Hatch saw Guzman and the period of time during which Stake saw Guzman.

During oral argument before this court, the State's counsel impliedly conceded, perhaps based on *State v. Guzman-Cuellar*, that the showup for Haven Scabbyrobe failed the first step of the *Manson* test. Counsel did not expressly state that the showup was impermissibly or unnecessarily suggestive. But, counsel indicated that the issue before the court was the second step or the reliability prong, after counsel conceded the suggestive element attended to the showup. Reliability becomes the issue only if the

14

identification procedure was impermissibly suggestive. The State's implied concession impacts my decision.

The majority writes that it may base its ruling on the first step of suggestiveness despite a concession by the State to the contrary. But the majority misses the significance of the State's concession. We do not address the admissibility of the eyewitness identification directly. Instead, we address the issue through the lens of a claim of ineffective assistance of counsel. The principal question before this court is whether the superior court would have granted a motion to suppress the eyewitness identification. Since the State concedes undue suggestiveness on appeal, the State likely would have conceded the issue before the superior court. The trial court would have then likely accepted the concession. In turn, the trial court would have more likely granted the motion to suppress the eyewitness identification evidence.

SECOND STEP OF ANALYSIS - RELIABILITY

A court's ruling that the identification procedure was unduly suggestive does not end the due process inquiry. The court must then balance the harm of the suggestiveness against the witness' reliability. *State v. Springfield*, 28 Wn. App. 446, 447 (1981). The key inquiry in determining admissibility of the identification is reliability. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

In *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), the United States Supreme Court identified five factors for evaluating reliability: the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy

15

of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. The court weighs these factors against the corrupting effect of the suggestive identification. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). In this analysis, the court reviews the totality of the circumstances. *Manson v. Brathwaite*, 432 U.S. 98, 110-11 (1977).

No court has addressed how the five factors should be weighed against one another. Instead, the analysis is ad hoc. *United States ex rel. Kirby v. Sturges*, 510 F.2d 397, 407-08 (7th Cir. 1975). Presumably not all of the factors must favor the accused in order for him or her to succeed in suppressing the evidence. Presumably not all of the factors must favor the State for the State to gain admission of the eyewitness identification. Perhaps all but one factor could favor one party, but the court still rule in favor of the opposing party because that one factor holds particular importance within the totality of the circumstances.

Reliability is generally a question for the factfinder. *State v. Vaughn*, 101 Wn.2d 604, 610-11 (1984). The United States Supreme Court deems juries capable of intelligently measuring the weight of questionable identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 116 (1997); *Simmons v. United States*, 390 U.S. 377, 384 (1968). Uncertainty or inconsistency in identification testimony generally goes to its weight, not its admissibility. *State v. Vaughn*, 101 Wn.2d at 610.

One obstacle to our review of whether the identification of Haven Scabbyrobe should have been suppressed is that our record only contains trial testimony. If

Scabbyrobe had filed a pretrial motion to suppress, the State may have presented

additional facts in an attempt to defeat the motion. The State may have sought admission

of one or more police reports. Nevertheless, the State and Scabbyrobe litigate the appeal

on the assumption that this court decides the efficacy of any defense motion to suppress

based on trial testimony. The State has not moved, pursuant to RAP 9.11, for the taking

of more evidence.

Reviewing courts expect the trial court to enter factual findings as to each of the

five elements of the eyewitness identification test. *State v. Kinard*, 109 Wn. App. 428,

434, 36 P.3d 573 (2001). In turn, appellate courts limit their review to whether

substantial evidence supports the trial court's findings. *State v. Hill*, 123 Wn.2d 641,

647, 870 P.2d 313 (1994). We otherwise defer to the trial court's decision. *State v.

Kinard*, 109 Wn. App. 428, 432 (2001). This court lacks any trial court decision to

review in Haven Scabbyrobe's appeal.

I now review the facts in light of the five *Manson* test components. The first

factor under the *Manson* test is the opportunity of the witness to view the criminal at the

time of the crime. We do not know the time elapse between when Huff entered the car

and when the culprit left his sight. One might assume that only seconds passed as Huff

confronted the culprit inside the car. Several seconds to thirty seconds elapsed while the

two stood outside the car. We do not know the extent to which Huff focused on the face

of the culprit, other than Huff saw a look of surprise and fear on the female's face as he

entered the Subaru. The culprit crawled over Huff as she exited through the passenger

17

door, but we do not know if Huff looked at her face or other parts of her body during this departure. Because of many conflicting factors, a court cannot discern whether the first test factor favors the State or Haven Scabbyrobe.

The first factor does not mention the distance from which or the length of time during which the witness views the suspect at the scene of the showup. Nevertheless, I question whether Jeffery Huff got a good look of Haven Scabbyrobe, at the location of the arrest, when Scabbyrobe was more than a football field's first down away from him.

The second factor in the *Manson* test is the witness' degree of attention. The record provides no evidence of the extent of Jeffery Huff's concentration on the features of Haven Scabbyrobe. Jeffery Huff was in an excited state. The second factor may be of no use for our analysis, but, assuming any use, the factor favors Scabbyrobe.

The third factor in the *Manson* test is the accuracy of the eyewitness's identification. We compare the description of the offender, given to law enforcement by the witness, with the actual features of the accused. Huff incompletely described the female culprit. Despite the witness crawling over his body inside the car, Huff did not describe the height, weight, or build of the culprit. Huff gave no description of footwear, headwear, or hand wear.

Jeffery Huff's slight description of the culprit did not coincide with the features of Haven Scabbyrobe. Huff described the culprit as a Hispanic with hair down to her breasts. Scabbyrobe is First American with hair to her shoulders. Jeffery Huff told

18

Sergeant Joseph Vanicek that the culprit wore a dark coat and dark sweatpants. Haven Scabbyrobe wore no coat. She wore basketball shorts and a black t-shirt.

The State contends that Jeffery Huff's willingness to admit that Haven Scabbyrobe wore different clothes brings credibility to his testimony. Maybe. Perhaps the traveling garbage truck explains the clothes discrepancy in that Scabbyrobe discarded her first wardrobe. Perhaps not. No testimony suggested that Haven Scabbyrobe is an accomplished and clever thief who knew, when she planned to purloin a car, that a garbage truck would circle the neighborhood. No evidence suggested Scabbyrobe was a quick change artist. The closer in time that the State's evidence brings the attempted theft to the identification, the more of an accomplished change artist Scabbyrobe becomes.

While inside the patrol car and shortly before the identification, Jeffery Huff announced that the culprit had a tattoo on her hand. He had not disclosed that information at his home. Huff never noticed a tattoo below Scabbyrobe's eye or a tattoo mark on the side of the face.

Sergeant Joseph Vanicek, contrary to his general practice, did not obtain a thorough description of the culprit from Huff. Huff's description lacked accuracy in many respects. If Huff had scrutinized the culprit's face and the culprit was Scabbyrobe, Huff should have noticed the tattoo under the eye. Officer Damon Dunsmore saw Haven Scabbyrobe running, but the culprit did not run from the presence of Jeffery Huff. The factor of an accurate description of the culprit militates strongly in favor of Scabbyrobe.

The fourth *Manson* test factor is the degree of certitude expressed by the eyewitness during the identification. Jeffery Huff, at the scene of the showup, declared one hundred percent certainty that Haven Scabbyrobe was the culprit. Thus, this element weighs in favor of the State. Nevertheless, at least one court and numerous commentators have declared the witness' degree of certainty in making the identification as a worthless indicator that he is correct. *People v. Anderson*, 389 Mich. 155, 205 N.W.2d, 461, 493-94 (1973); Frank O'Connor, *"That's the Man": A Sobering Study of Eyewitness Identification and the Polygraph*, 49 ST. JOHN'S L. REV. 1, 4-6 (1974); Felice J. Levine & June Louin Tapp, *The Psychology of Criminal Identification: The Gap from Wade to Kirby*, 121 U. PA. L. REV. 1079 (1973); PATRICK M. WALL, EYE-WITNESS IDENTIFICATION IN CRIMINAL CASES 15-16 (1965).

The final component of the *Manson* test is the time between the crime and the confrontation. We do not know the distance that Jeffery Huff and Sergeant Vanicek traveled to the location of the detention of Haven Scabbyrobe. We do not know the precise time elapse between the culprit leaving the sight of Huff and Huff's identification of Scabbyrobe. Seven to twenty minutes elapsed. This factor favors the State.

## MEMORY RESEARCH

The United States Supreme Court has never identified the sources on which it relied when fashioning, in *Neil v. Biggers*, 409 U.S. 188 (1972), the list of five factors of reliability that became the *Manson* test of admissibility of eyewitness identification

testimony. We do not know if the Court relied on psychological studies or memory research.

Social scientists studying the phenomenon of eyewitness memory have long argued that the Supreme Court's decisions in *Neil v. Biggers* and *Manson v. Brathwaite* exacerbated the risks of misidentification because the Court ruled that even identifications resulting from highly suggestive procedures may nevertheless be admitted given other indicia of eyewitness reliability. Brandon L. Garrett, *Judging Innocence*, 108 COLUM. L. REV. 55, 88-81 (2008). These additional indicia of certainty, according to critics, engender a false confidence of reliability. Brandon L. Garrett, 108 COLUM. L. REV. at 80-81. Commentators, in turn, emphasize that the *Manson* test rarely results in the exclusion of eyewitness identification evidence. Lawrence Rosenthal, *Eyewitness Identification and the Problematics of Blackstonian Reform of the Criminal Law*, 110 J. CRIM. L. & CRIMINOLOGY 181, 185 (2020).

Witness misidentification of suspects plagues the United States. Recent evidence overwhelmingly establishes that eyewitness identification is erroneous approximately one-third of the time. Bruce W. Behrman & Sherrie L. Davey, *Eyewitness Identification in Actual Criminal Cases: An Archival Analysis*, 25 LAW & HUM. BEHAV. 475, 482 (2001); Brief for Am. Psychological Ass'n as Amici Curiae Supporting Petitioner at 14-17, *Perry v. New Hampshire*, No. 10-8974 (U.S. Aug. 5, 2011). Experts estimate that 5,000 to 10,000 felony convictions in the United States each year are wrongful. Taki V. Flevaris & Ellie F. Chapman, 38 SEATTLE U. L. REV. at 861 (2015). Eyewitness

misidentification plays a role in approximately seventy five percent of the numerous convictions overturned by post-conviction DNA testing nationwide. *Perry v. New Hampshire*, 565 U.S. 228, 263 n.6, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012) (Sotomayor, J., dissenting); *In Focus: Eyewitness Misidentification*, INNOCENCE PROJECT (Oct. 21, 2008), https://innocenceproject.org/in-focus-eyewitness-misidentification/; Joyce W. Lacy & Craig E.L. Stark, *The Neuroscience of Memory: Implications for the Courtroom*, 14 NATURE REVS. NEUROSCIENCE 649 (2013); BRANDON L. GARRETT, CONVICTING THE INNOCENT: WHERE CRIMINAL PROSECUTIONS GO WRONG 48 (2011); Samuel R. Gross, *Loss of Innocence: Eyewitness Identification and Proof of Guilt*, 16 J. LEGAL STUD. 395, 396 (1987); David E. Paseltiner, Note, *Twenty-Years of Diminishing Protection: A Proposal to Return to the* Wade *Trilogy's Standards*, 15 HOFSTRA L. REV. 583, 605-06 (1987); Steven P. Grossman, *Suggestive Identifications: The Supreme Court's Due Process Test Fails to Meet Its Own Criteria*, 11 U. BALT. L. REV. 53, 65 (1981).

Even the United States Supreme Court has long recognized the "vagaries of eyewitness identification." *United States v. Wade*, 388 U.S. 218, 228 (1967). Usually the witness must testify about an encounter with a total stranger under circumstances of emergency or emotional stress. *Manson v. Brathwaite*, 432 U.S. 98, 112 (1977). The witness' recollection of the stranger can be easily distorted by the circumstances or by later actions of the police. *Manson v. Brathwaite*, 432 U.S. 98, 112 (1977).

In many cases a suspect need not bear any resemblance to the real perpetrator for an eyewitness to falsely identify the suspect. Taki V. Flevaris & Ellie F. Chapman, 38

SEATTLE U. L. REV. at 866-67 (2015). Decades of research has demonstrated that memory is often incomplete and inaccurate, depends on the witness' goals and expectations, and is influenced by a suggestive process. Taki V. Flevaris & Ellie F. Chapman, *Cross-Racial Misidentification: A Call to Action in Washington State and Beyond*, 38 SEATTLE U. L. REV. 861, 870 (2015).

Eyewitness confidence is malleable and provides no guarantee of accuracy. Taki V. Flevaris & Ellie F. Chapman, 38 SEATTLE U. L. REV. at 866-67 (2015). Mistaken eyewitnesses generally believe they are telling the truth and, as a result, their testimony will seem sincere and often will be impervious to cross-examination. Taki V. Flevaris & Ellie F. Chapman, 38 SEATTLE U. L. REV. at 870 (2015). Jurors tend to accept identifications by well-intended and seemingly disinterested persons as absolute proof. Timothy P. O'Toole & Giovanna Shay, Manson v. Brathwaite *Revisited: Towards a New Rule of Decision for Due Process Challenges to Eyewitness Identification Procedures*, 41 VAL. U. L. REV. 109, 134-35 (2006). Jurors place the greatest weight on eyewitness confidence in assessing identifications even though the witness' false confidence is a poor gauge of accuracy. *Perry v. New Hampshire*, 565 U.S. 228, 260 (2012) (Sotomayor, J., dissenting). Almost nothing convinces a jury more "than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'" *Watkins v. Sowders*, 449 U.S. 341, 352, 101 S. Ct. 654, 66 L. Ed. 2d 549 (1981) (Brennan, J., dissenting).

Members of the public disagree with the expert consensus of the nature and hazards of memory. Eyewitness testimony is far less accurate than most jurors believe. Taki V. Flevaris & Ellie F. Chapman, *Cross-Racial Misidentification: A Call to Action in Washington State and Beyond*, 38 SEATTLE U. L. REV. 861, 866-67 (2015); Jennifer E. Dysart et al., *Show-ups: The Critical Issue of Clothing Bias*, 20 APPLIED COGNITIVE PSYCHOL. 1009, 1017-19 (2006); Gary L. Wells & Elizabeth A. Olson, *Eyewitness Testimony*, 54 ANN. REV. PSYCHOL. 277, 284-85 (2003). Even effective cross-examination fails to increase juror sensitivity to the inaccuracy of eyewitness testimony. Michael R. Leippe, *The Case for Expert Testimony about Eyewitness Memory*, 1 PSYCHOL., PUB. POL'Y & L. 909, 923-25 (1995).

Lawyers and judges do not recognize that members of a typical jury pool misunderstand the fallibility of eyewitness testimony and may rely too heavily on confident witness statements. Daniel J. Simons & Christopher F. Chabris, *What People Believe about How Memory Works: A Representative Survey of the U.S. Population*, 6 PUB. LIBR. SCI. ONE, no. 8 (2011); Taki V. Flevaris & Ellie F. Chapman, *Cross-Racial Misidentification: A Call to Action in Washington State and Beyond*, 38 SEATTLE U. L. REV. 861, 870 (2015). Jurors, attorneys, and police remain unaware of the nature and extent of the problem and continue to give undue weight to eyewitness evidence. Taki V. Flevaris & Ellie F. Chapman, *Cross-Racial Misidentification: A Call to Action in Washington State and Beyond*, 38 SEATTLE U. L. REV. 861 (2015).

In *Commonwealth v. Johnson*, 420 Mass. 458, 650 N.E.2d 1257 (1995), the Massachusetts Supreme Judicial Court rejected the *Manson* test as satisfying the requirements of its own constitution because of the dangers posed whenever the Commonwealth introduces eyewitness evidence against an accused. According to the court, those dangers require the utmost protection against mistaken identifications. Since mistaken identifications are the greatest cause of erroneous convictions, law enforcement officers must employ the fairest identification procedures available under the circumstances. According to the Massachusetts court, the *Manson* "reliability test" is unacceptable because it provides little or no protection from unnecessarily suggestive identification procedures, from mistaken identifications, and, ultimately, from wrongful convictions.

Based on memory research, Justice Thurgood Marshall lamented the Supreme Court's decision in *Manson v. Brathwaite*. According to Justice Marshall, the frequent untrustworthiness of eyewitness identification testimony poses an unusual threat to the truth-seeking process promoted by *Manson v. Brathwaite*, 432 U.S. 98, 119-20 (1977) (Marshall, J., dissenting). Juries unfortunately are often unduly receptive to such evidence. *Manson v. Brathwaite*, 432 U.S. 98, 119-20 (1977) (Marshall, J., dissenting). The Supreme Court's totality test allows a jury to hear unreliable and misleading evidence. *Manson v. Brathwaite*, 432 U.S. 98, 128 (1977) (Marshall, J., dissenting). Equally important, the deceptive evidence allows criminals to remain on the streets while

citizens assume that police action has given them protection.  *Manson v. Brathwaite*, 432

U.S. 98, 127-28 (1977) (Marshall, J., dissenting).

## CROSS-RACIAL IDENTIFICATION

The record does not record the ethnicity of Jeffery Huff, although his surname is

an English topographical name for one who lives by the heel of a hill.  Huff told Sergeant

Joseph Vanicek that the culprit was Hispanic.  Haven Scabbyrobe is Native American.

Even more problematic with inaccuracy than eyewitness misidentification in

general is cross-racial eyewitness misidentification.  Taki V. Flevaris & Ellie F.

Chapman, *Cross-Racial Misidentification: A Call to Action in Washington State and

Beyond*, 38 SEATTLE U. L. REV. 861, 870 (2015); *State v. Cheatam*, 150 Wn.2d 626, 81

P.3d 830 (2003).  Eyewitnesses who identify someone of a race other than their own tend

to be especially unreliable.  Taki V. Flevaris & Ellie F. Chapman, *Cross-Racial

Misidentification: A Call to Action in Washington State and Beyond*, 38 SEATTLE U. L.

REV. at 870-71 (2015); Thomas Dillickrath, *Expert Testimony on Eyewitness

Identification: Admissibility and Alternatives*, 55 U. MIAMI L. REV. 1059, 1063-65

(2001).  In the case of facial identification, a witness is typically most familiar and

knowledgeable about the facial features of his or her own race and less so of other races

or ethnic backgrounds.  Joyce W. Lacy & Craig E.L. Stark, *The Neuroscience of

Memory: Implications for the Courtroom*, 14 NATURE REVS. NEUROSCIENCE 649 (2013).

One analysis covering over thirty years of eyewitness studies concluded that

eyewitnesses are 56 percent more likely to falsely identify an individual if the individual

is of another race.  Christian A. Meissner & John C. Brigham, *Thirty Years of Investigating the Own-Race Bias in Memory for Faces: A Meta-Analytic Review*, 7 PSYCHOL., PUB. POL'Y & L. 3, 15 n.17 (2001); Taki V. Flevaris & Ellie F. Chapman, *Cross-Racial Misidentification: A Call to Action in Washington State and Beyond*, 38 SEATTLE U. L. REV. 861, 870-71 (2015).

The State relies on cross-racial identification in a substantial number of prosecutions.  Taki V. Flevaris & Ellie F. Chapman, *Cross-Racial Misidentification: A Call to Action in Washington State and Beyond*, 38 SEATTLE U. L. REV. 861, 871 (2015). As with eyewitness misidentification in general, research shows that most jurors are either misinformed about, or unaware of, the inaccuracy of cross-racial identification in particular.  Taki V. Flevaris & Ellie F. Chapman, *Cross-Racial Misidentification: A Call to Action in Washington State and Beyond*, 38 SEATTLE U. L. REV. 861, 871 (2015). Compounding the problem, jurors believe cross-racial identification is *more* accurate than same-race identification when in fact research shows the opposite.  Richard S. Schmechel et al., *Beyond the Ken? Testing Jurors' Understanding of Eyewitness Reliability Evidence*, 46 JURIMETRICS 177, 200 (2006).

Once misidentified, racial minorities in Washington face disparately higher rates of arrest, charging, and conviction and receive harsher sentences, even after controlling for legally relevant factors.  Research Working Group of the Task Force on Race & the Criminal Justice System, *Preliminary Report on Race and Washington's Criminal Justice System*, 35 SEATTLE U. L. REV. 623, 647 (2012); Taki V. Flevaris & Ellie F. Chapman,

*Cross-Racial Misidentification: A Call to Action in Washington State and Beyond*, 38 SEATTLE U. L. REV. 861, 864 (2015). While minorities are overrepresented in the prison population, many more exonerees were minorities than is typical even among average populations of rape and murder convicts. Brandon L. Garrett, *Judging Innocence*, 108 COLUM. L. REV. 55, 66-67 (2008). Cross-racial identifications may be one explanation for the disproportionate conviction of minorities among those exonerated by postconviction DNA testing. Brandon L. Garrett, *Judging Innocence*, 108 COLUM. L. REV. 55, 79 (2008). Unfortunately Haven Scabbyrobe lacks any DNA evidence to exculpate her.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Because her trial counsel did not object to the evidence, Haven Scabbyrobe does not assign error to any ruling by the trial court to admit the corporeal identification by Jeffery Huff. Thus, this court must analyze the appeal under the rubric of ineffective assistance of counsel. The State does not contend that, assuming the identification by Huff should have been suppressed, trial counsel still acted effectively. The State does not argue that Scabbyrobe enjoyed some tactical advantage by not seeking suppression.

To prevail on a claim of ineffective assistance, the accused must show that her counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced her. *In re Personal Restraint of Morris*, 176 Wn.2d 157, 166, 288 P.3d 1140 (2012) (plurality opinion). Prejudice exists if there is a reasonable probability that, except for counsel's errors, the result of the proceeding would

have differed. *State v. Estes*, 193 Wn. App. 479, 488, 372 P.3d 163 (2016), *aff'd*, 188 Wn.2d 450, 395 P.3d 1045 (2017).

Under general jurisprudence of ineffective assistance of counsel, the defendant, to establish prejudice, must "prove that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). This principle suggests that the accused must establish that he likely would have been acquitted. Nevertheless, the standard is lower than a preponderance standard. *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017). A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *State v. Gregory*, 192 Wn.2d 1, 22, 427 P.3d 621 (2018) (plurality opinion) (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

Haven Scabbyrobe contends that trial counsel should have filed a motion to suppress. In the context of failing to file a motion to suppress, a court will deem defense counsel's performance deficient only if the accused can show that the trial court likely would have granted the motion. *In re Personal Restraint of Davis*, 152 Wn.2d 647, 711, 101 P.3d 1 (2004); *State v. D.E.D.*, 200 Wn. App. 484, 490, 402 P.3d 851 (2017). Conversely, the court denies the claim of ineffective assistance if a challenge to admissibility of evidence would have failed. *State v. Nichols*, 161 Wn.2d 1, 14-15, 162 P.3d 1122 (2007).

29

The general principle of prejudice attended to the failure to file a motion to suppress follows the general standard of prejudice for other claims of ineffective assistance of counsel in that the suppression rule appears to require the accused to show that more likely than not the trial court would have granted a motion to suppress. Contrary to other claims of ineffective assistance of counsel, however, no court has modified the suppression standard by stating that the standard is less than a preponderance. No court has ruled that the reviewing court need only maintain an undermined confidence in the admissibility of the evidence.

WASHINGTON SUPREME COURT 2020 PROCLAMATION

Haven Scabbyrobe directs this court's attention to a June 4, 2020 letter issued by the Washington Supreme Court to the state judiciary and legal community. Letter from Wash. State Supreme Court to Members of Judiciary & Legal Cmty. (June 4, 2020), https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%20060420.pdf [https://perma.cc/QNT4-H5P7]. The full text of the open letter is appended to this opinion. Presumably the protests surrounding the deaths of George Floyd, Breonna Taylor, and Ahmaud Arbery, the false accusations of Karens against African-American males, and the many corporate pronouncements supporting Black Lives Matter prompted the Supreme Court's letter.

The Supreme Court's June 2020 letter mentions "racialized policing" and the "overrepresentation of black Americans in every stage of our criminal and juvenile justice systems." This reference to overrepresentation could also mention Latinx and

30

Haven Scabbyrobe's Native American race. According to the Supreme Court, the Washington State legal community must recognize that we all bear responsibility for this enduring injustice. The letter exhorts the community to exercise the courage and will to end the injustice. The letter continues that judges must develop a greater awareness of our own conscious and unconscious biases in order to administer justice in a way that brings racial fairness to our legal system. The Supreme Court ends by calling on "every member of our legal community to reflect on this moment and ask ourselves how we may work together to eradicate racism."

The Washington Supreme Court's open letter is long on abstract aspirations and short on definitive directions to lower court judges. Whereas, I acknowledge the need to attain the goals stated in the letter, I also recognize the ease at which an appellate court can pontificate from on high while ignoring that trial judge's work in a milieu that demands quick multi-factored decisions with little assistance. Discerning racial bias is not always easy for white judges, and judges naturally resent accusations of racial bias. Some jurists already criticize the Washington Supreme Court's letter as hypocritical in light of the court's own rulings.

A primary complaint of ethnic minorities about the American justice system concerns mass incarceration of members of their groups and the corresponding long sentences meted to offenders. Jonathan Segall, *Mass Incarceration, Ex-Felon Discrimination & Black Labor Market Disadvantage*, 14 U. PENN. J. L. & SOC. CHANGE 159 (2011); Dorothy E. Roberts, *The Social and Moral Cost of Mass Incarceration in*

*African American Communities*, 56 STAN. L. REV. 1271, 1304 (2004); *Mass Incarceration*, ACLU, https://www.aclu.org/issues/smart-justice/mass-incarceration (last visited Mar. 11, 2021). Nevertheless, Washington Supreme Court decisions affirming convictions and long sentences prolong the present state of mass incarceration. For example, the court affirmed a lifetime sentence for reformed juvenile offenders, in *State v. Ramos*, 187 Wn.2d 420, 387 P.3d 650 (2017), despite the ruling conflicting with United States Supreme Court precedent allowing lifetime incarceration only for the rarest of individuals and only those irreparably depraved. *Montgomery v. Louisiana*, __ U.S. __, 136 S. Ct. 718, 734, 193 L. Ed. 2d 599 (2016); *Miller v. Alabama*, 567 U.S. 460, 479-80, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). Recently the state high court declined constitutional review of the state's three strikes law. Black people account for thirty eight percent of prisoners sentenced to lifetime incarceration, but only four percent of the state's population. Nina Shapiro, Washington Supreme Court Declines Broad Review of Three-Strikes Law, but Signals Approval to Resentence One Prisoner, SEATTLE TIMES (Feb. 8, 2021), https://www.seattletimes.com/seattle-news/crime/washington-supreme-court-conveys-approval-of-resentencing-three-strikes-prisoner/.

By citing the Supreme Court's 2020 letter, Haven Scabbyrobe claims her ethnicity influenced her detainment, identification, prosecution, and conviction. Scabbyrobe particularly asserts that Officer Damon Dunsmore stopped her only because she was the first brown woman he encountered. The State responds that the record does not show that Scabbyrobe was the first brown woman Dunsmore encountered. Of course, the

opposite is also true. The record does not indicate whether Dunsmore encountered any other brown woman before stopping Scabbyrobe.

The State also counters that Officer Damon Dunsmore detained Haven Scabbyrobe because she wore shorts in 34 degree weather and did not wear running shoes. Scabbyrobe answers that the State's emphasis on her outfit and footwear also shows discrimination toward her race and income. Others run in shorts during cold weather, and not everyone can afford Versace Chain Reaction Gold-Sole Trainer Sneakers. Recently, on a snowy day in Spokane, I saw pedestrians outside wearing shorts and summer footwear.

The State's argument that Officer Damon Dunsmore did not stop Haven Scabbyrobe because of her race assumes that Scabbyrobe must prove overt bias. The Supreme Court's open letter, however, advises judges to recognize that implicit racial bias blights our judicial system regardless of open racism.

I assume that the Supreme Court does not ask lower courts to absolve all members of minority groups from criminal charges. The open letter does not ask that this court abandon reason and automatically reverse Haven Scabbyrobe's conviction. Nevertheless, Scabbyrobe's appeal presents the problem of possible implicit prejudice because a law enforcement officer stopped Scabbyrobe for wearing unsuitable clothes, if not for the darker color of her skin, and because the eyewitness identified one not a member of his race. Therefore, I agree with Scabbyrobe that the Supreme Court's June 2020 letter directs this court to ask whether racism tainted her identification and subsequent

prosecution. I also read the court's letter as expressing an expectation for the trial court to consider the possibility of racism in the detention and identification of Scabbyrobe if faced with a motion to suppress the identification. Unfortunately the open letter lacks insight into identifying when racism impacts a prosecution and conviction of a member of a minority race and fails to provide guidelines to resolve cases of cross-racial eyewitness identification. Perhaps further illumination and directions were not possible.

A thief should not avoid punishment; but my greater concern is an erroneous conviction of a Native American because of a misidentification. Something must be done to curtail the innumerable and inexcusable wrongful convictions based on eyewitness false identification. The facts of this appeal undermine my confidence in the conviction and more importantly undermine my belief in the accuracy of the identification by Jeffery Huff of Haven Scabbyrobe during her detention in the presence of a law enforcement officer. The failure of defense counsel to bring a motion to suppress served no trial strategy and fell below the standard of care of defense counsel.

The State argues that reviewing courts must rely on the good sense of the jury. Research shows otherwise, and Haven Scabbyrobe's jury tried to convince the trial judge that it was at an impasse.

I would vacate the conviction of Haven Scabbyrobe and remand for a new trial without admission of evidence that Jeffery Huff identified Scabbyrobe as the thief. At the least, I would remand for a hearing as to whether the eyewitness identification evidence should have been submitted to the jury.

I dissent:

_____
Fearing, J.

Appendix

June 4, 2020 Dear Members of the Judiciary and the Legal Community:

We are compelled by recent events to join other state supreme courts around the nation in addressing our legal community.

The devaluation and degradation of black lives is not a recent event. It is a persistent and systemic injustice that predates this nation's founding. But recent events have brought to the forefront of our collective consciousness a painful fact that is, for too many of our citizens, common knowledge: the injustices faced by black Americans are not relics of the past. We continue to see racialized policing and the overrepresentation of black Americans in every stage of our criminal and juvenile justice systems. Our institutions remain affected by the vestiges of slavery: Jim Crow laws that were never dismantled and racist court decisions that were never disavowed.

The legal community must recognize that we all bear responsibility for this ongoing injustice, and that we are capable of taking steps to address it, if only we have the courage and the will. The injustice still plaguing our country has its roots in the individual and collective actions of many, and it cannot be addressed without the individual and collective actions of us all.

As judges, we must recognize the role we have played in devaluing black lives. This very court once held that a cemetery could lawfully deny grieving black parents the right to bury their infant. We cannot undo this wrong—but we can recognize our ability to do better in the future. We can develop a greater awareness of our own conscious and unconscious biases in order to make just decisions in individual cases, and we can administer justice and support court rules in a way that brings greater racial justice to our system as a whole.

As lawyers and members of the bar, we must recognize the harms that are caused when meritorious claims go unaddressed due to systemic inequities or the lack of financial, personal, or systemic support. And we must also recognize that this is not how a justice system must operate. Too often in the legal profession, we feel bound by tradition and the way things have "always" been. We must remember that even the most venerable precedent must be struck down when it is incorrect and harmful. The systemic oppression of black Americans is not merely incorrect and harmful; it is shameful and deadly.

Finally, as individuals, we must recognize that systemic racial injustice against black Americans is not an omnipresent specter that will inevitably persist. It is the collective product of each of our individual actions—every action, every day. It is only by carefully reflecting on our actions, taking individual responsibility for them, and constantly striving for better that we can address the shameful legacy we inherit. We call on every member of our legal community to reflect on this moment and ask ourselves how we may work together to eradicate racism.

As we lean in to do this hard and necessary work, may we also remember to support our black colleagues by lifting their voices. Listening to and acknowledging their experiences will enrich and inform our shared cause of dismantling systemic racism.

We go by the title of "Justice" and we reaffirm our deepest level of commitment to achieving justice by ending racism. We urge you to join us in these efforts. This is our moral imperative.